## DECEMBER TERM, 1843.

THOMAS E. ROBINS, *et al. v.* BOWLING EMBRY, *et al.*

A corporate body can make an assignment of its property, in trust, for the payment of its just debts, preserving to each creditor the right of sharing, *equally*, according to the amount of his claim.

The property of a banking corporation is a *trust fund* for all its creditors ; and in an assignment by such a corporation, if a preference in favor of the debts due to any particular creditor, or set of creditors, is given, the assignment will be void. *Sed quære.*

Banking corporations are trustees, not only for the stockholders, but also for the creditors, who have *a prior and paramount equity.*

The creditors of a corporate body can enforce their claims against any of the property of the incorporation, in the hands of persons affected with a knowledge of its corporate character.

It is essential to the validity of an assignment, by an incorporation, that the assignor, by the assignment, part absolutely with all title to the property, and all authority to control it, free from all restrictions that will unnecessarily delay creditors ; there must be no reservation, for the assignor's benefit, except of the surplus ; no authority given to control or direct the assignees ; and all the uses must be expressly declared ; where any of these objections exist, the assignment will be void.

A banking company, to which a railroad was by its charter affixed, having nearly completed the road, and exhausted its means, being compelled to make an assignment for the benefit of its creditors, and the period for completing the road allowed by the charter of the company having nearly expired, the expiration of which, without the completion of the road, would cause a forfeiture of the charter, and the road, in its then condition, being comparatively worthless, and its not being completed would be a total loss to the company of the amount expended, and would, if not destroy, greatly diminish, the ability of the company to meet its debts ; *held,* that a provision in the deed of assignment authorizing the assignees to borrow two hundred and fifty thousand dollars to complete the road, and pledging the assets of the company, and the profits of the road, for the payment of that sum when borrowed, before any of the other debts were paid, *did not vitiate the assignment.*

If an assignment be otherwise free from the imputation of fraud, it is not vitiated by being made in part to secure anticipated advances, especially where those advances are in aid of the general purposes of the assignment.

A banking corporation with a railroad annexed, in making an assignment of its effects to assignees, to pay its debts, assigned to the assignees the power of managing and controlling the railroad ; *held,* that this provision of the assignment merely assigned the profits of the road, with the temporary control of the road, to the assignees, for the benefit of the creditors, and did not vitiate the assignment.

In such case, if the charter had required a committee of the directory to manage the road, an assignment by the directory, of the management of the road, to others than a committee of the directory, would be a matter between the directors and stockholders, or the latter and the government, and could not be questioned by another person.

A provision, in a deed of assignment, by a corporation, that the directory should have power to appoint new trustees to fill any vacancy that may occur by death or otherwise, is not a reservation that will vitiate the assignment.

Robins, et al. *v.* Embry, et al.

Where, by an assignment for the benefit of creditors, twelve months were allowed to collect the debts, and convert into money the property of the assignor, before distribution among the creditors, the debts being numerous, and widely scattered over the country, and the creditors of the assignor residing at distant places ; *held,* that the time allowed was not unreasonable, and would not render the assignment void.

Where an assignment is made by a bank, of its effects, to pay its debts, at a period of great pecuniary embarrassment, and general insolvency, and power is given by the assignment to the assignees to compromise with the debtors of the bank, in such manner as would be, in the judgment of the assignees, " *to the interest of the creditors of said bank ;*" *held,* that the assignment was not vitiated by such a provision, and the power might be exercised.

Where a bank, with a railroad attached, in an assignment of its effects, made the assignees the joint agents of the bank and its creditors ; in the management of the road, the agents of the bank ; and in the receipt and disbursements of its profits, the agents of the creditors ; *held,* that the provision in the assignment gave the bank no control over the assignees, and did not avoid the assignment.

A railroad, built by an incorporated company, for public travel and transportation, is a mere *franchise,* and not assignable by the company.

In an assignment, by a bank, of its effects, a provision, prohibiting the assignees from paying any claims, until their validity has been tested in a mode pointed out in the assignment, *held,* not to avoid the assignment.

Where, in a deed of assignment of its property, a bank conveyed, in general words, *all its effects, held,* that the omission to annex a schedule of the property assigned is no objection to the validity of the assignment.

In a deed of assignment by a bank, a covenant, on the part of the assignees, to exhibit, periodically, a statement of their accounts to the board of directors, is no objection to the validity of the assignment.

Where a deed of assignment, by an incorporation, of its effects, for the payment of its debts, is void in part, it is void *in toto.*

A provision in a deed of assignment, by a bank, requiring the assignees " *to pay all the necessary expenses of the president, directors, and company of the bank, in the management of the corporation,*" *held,* not to be such a reservation, for the benefit of the grantor, as will make the assignment void *upon its face ;* the fund assigned for the payment of the debts being not only of a limited and definite amount, but also of an indefinite assignment of annually-accruing profits ; and the reservation not appearing to be for any fraudulent purpose.

THOMAS E. ROBINS, William S. Bodley, and William C. Walker, filed their bill, in which they state, that on the 13th day of February, A. D. 1840, the President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, a duly incorporated company, assigned, by two deeds of assignment, all its property, and all the proceeds and profits of the railroad, to assignees, for the benefit of the creditors of the company. These deeds were exhibited with the bill. That Thomas E. Robins, William S. Bodley, and William W. Frazier, were the assignees of the bank, who accepted, and entered upon the discharge of the trusts

contained in the assignments ; that they had provided funds to, and did complete the railroad unfinished at the time of the assignment, and proceeded to the collection of the debts ; that in June, 1841, W. W. Frazier resigned his office as trustee, and William C. Walker was appointed, in the mode prescribed by the deeds, in his stead ; that since the execution of the deeds of assignment and the transfer of the effects of the bank to the assignees, various creditors of the bank had obtained judgments to different amounts against the company, and had levied executions upon real estate, belonging to the company before the assignment, and conveyed to the assignees, upon which the depot buildings attached to the railroad, in the city of Vicksburg, were erected ; the bill prayed for an injunction, which was granted.

An amended bill was afterwards filed, stating, that the assignees, immediately upon the execution of the deeds of assignment, had taken possession and full control of all the property assigned ; that at the time of the assignment, the railroad was finished only thirty miles in length, and did not extend to Jackson, its eastern terminus, by fourteen miles ; that the part of the road then completed cost about eighteen hundred thousand dollars, all of which would have been hazarded, and probably lost : the public, and the creditors of the bank, would have been greatly injured, if the road had not been finished by the time stipulated in the charter.

" That the money stipulated to be borrowed to finish and complete the road, had been borrowed, and was advanced on the faith of the stipulation contained in the assignment ; that the intention of the bank, in making said provision to borrow the money to complete the road, was honest and *bonâ fide ;* that at the time of the assignment, the bank was embarrassed in her condition, a large amount of debts was due to her, but it was almost impossible to realize them, or a greater part of them, for a long time thereafter ; that the bank was without means to complete the road, and could not have done so within the time stipulated in the charter, without borrowing money as stipulated in the assignment ; the time within which said road was to be completed had nearly expired, not more than about twelve months being left within which to complete it ;

that, in pursuance of the power given them, they borrowed the money to complete the road, and that it has since been completed, and is now in successful operation."

To this bill, and amended bill, there was a general demurrer, filed by A. H. Arthur, one of the defendants. The deeds of assignment in the case are subjoined ; they are lengthy, but the points assailed are so scattered through the deed, that they cannot be fairly presented, if the deeds are abbreviated.

" This indenture, made and entered into this thirteenth day of February, 1840, between the President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, of the first part; W. W. Frazier, Thomas E. Robins, and William S. Bodley, of the second part ; and various other persons and corporations, creditors of said party of the first part, who may become parties to this deed in the manner herein provided, of the third part. Witnesseth, that the said President, Directors, and Company of the Commercial and Railroad Bank, in consideration of the sum of five dollars to them in hand paid, the receipt whereof is hereby acknowledged ; and further, in consideration of the covenants, stipulations, and agreements herein contained, have given, granted, bargained, sold, transferred, and assigned ; and by these presents, do bargain, sell, transfer, and assign, to the said W. W. Frazier, Thomas E. Robins, and William S. Bodley, and to the survivor of the said trustees, and to the heirs, executors, and administrators of such survivor, all the slaves, mules, oxen, carts, iron, wagons, and implements to work on the railroad, now building by said party of the first part, which said slaves, horses, carts, mules, oxen, and implements they are now using on, and upon said railroad, in finishing and completing the same. They also, for the consideration aforesaid, transfer and assign the profits of said railroad, from and after the registration of this deed, until said railroad is finally completed to Jackson, to the said parties of the second part.

" To have and to hold the aforesaid property and profits to the said parties of the second part, and to the survivor of them, and to the heirs, executors, &c., of said survivor. In trust, however, and upon the following terms, and conditions. Whereas the legislature, in incorporating the said Commercial and Railroad Bank of

Vicksburg, by the fifth section of the charter, made it the imperative duty of the said Commercial and Railroad Bank of Vicksburg, to construct the railroad between Vicksburg and Jackson, and to keep the same in operation, and by the terms of said charter, if said road is not finished within six years from the first election of directors, the said charter is declared null and void ; and whereas the time has nearly arrived, when said road must, by the terms of the charter, be finished, and whereas it formed and constituted a part of the contract, as manifested in said charter, by and between the stockholders of said Commercial and Railroad Bank, that they would complete the said road, the making of which is declared to be the primary object in granting the charter ; and whereas, it is essential to the creditors of said institution, that said road should be finished by the time stipulated, otherwise the corporation will be dissolved, and all debts due to it, and from it, will be extinguished, and the road, as far as now made, be forfeited ; and whereas the profits of said road, will, if not wholly sufficient, greatly aid in paying the debts due by said bank, therefore the main and principal object of this deed of trust, is to secure to the creditors of said institution the benefit and advantages of said road, and by completing the same, afford facilities for the payment of the debts of said bank. Therefore, the said parties of the second part, are hereby declared to hold said property and profits herein transferred, in trust for all the creditors of said Commercial and Railroad Bank ; and, with a view more effectually to carry the provision of this deed of trust into effect, the said trustees are hereby declared to be the joint agents of the party of the first part, and of all the creditors of said Commercial and Railroad Bank, who become parties hereto, as herein provided ; and, as such agents, the said trustees are hereby authorized and empowered to take possession of said railroad, and control the same for the purpose of ascertaining and receiving the profits of said road, until it is finished and completed to Jackson, and they are hereby authorized and empowered to appoint and employ all necessary agents, engineers, hands, &c., and to purchase all necessary implements, property, engines, and provisions necessary to carry on said road, and to keep the same in repair, and in full operation, until it is finally

completed. And the said trustees hereby stipulate to keep a full, accurate, and complete account of all the receipts and expenditures of the said road, and furnish the same semiannually to the board of directors of said Commercial and Railroad Bank ; and it is further stipulated and agreed, that all the slaves, wagons, carts, horses, mules, oxen, and other property and implements, of every kind and description, now in possession of said party of the first part, and in use on said road, shall be possessed, retained, and used for the purpose of finishing said road, and the same shall be retained and used by said trustees for the benefit of all concerned, until said road is completed ; after which time, said slaves, property, horses, mules, oxen, and other property, shall be sold by said trustees ; provided, however, that said trustees shall have liberty, when they deem it necessary, to sell any of said property, before said road is completed, and purchase other if necessary in its stead, or they may exchange the same for other property, whenever they may believe it to be for the interests of all the parties concerned that it should be done ; and said property, so purchased, or received in exchange, shall be held subject to the trusts of this deed ; and it is hereby made the duty of said trustees, to appropriate the profits of said road, or so much *of them* as may be deemed necessary, to the finishing of said road ; and the fund arising from the sale of the property herein conveyed, and the surplus profits, if there should be any, together with all the future profits of said road, after it shall have been finished (after first paying or deducting all the necessary expenses of this deed of trust), shall be the net proceeds or avails in the hands of said trustees, to be appropriated *pro rata* in payment of the debts of the party of the first part.

· " And whereas the said party of the first part has this day, by deed, bearing even date with this, conveyed all of its property, choses in action, &c., except the property embraced in this deed, to the said W. W. Frazier, Thomas E. Robins, and W. S. Bodley, for the uses and purposes mentioned in said deed ; and whereas said deed points out the manner and mode of notifying the creditors of said party of the first part, and also the manner and mode by which the creditors may, and shall, become parties thereto, and

the manner and mode of dividing and appropriating the trust-fund among the various creditors of said party of the first part, it is therefore declared and agreed that the fund, arising under this deed of trust, shall be appropriated and divided among the creditors of the party of the first part, in the manner, and in the order, and according to the terms and stipulations, mentioned and contained in said deed of trust herein referred to. And it is hereby made the duty of the said trustees, to make publication at such times and places, and for such length of time, as will give to the creditors of said Commercial and Railroad Bank, notice of the execution of this deed of trust, and the one before referred to, and said trustees shall, by such publication, notify and require all the creditors of said Commercial and Railroad Bank, to file their claims within the time, and in the manner, pointed out in the deed of trust herein referred to, as having been executed this day by said party of the first part ; and the mode and manner of ascertaining the validity of claims pointed out in said deed of trust shall govern in this; and all the creditors who file their claims as required by said deed of trust, will be considered as parties to this deed of trust.

" In testimony whereof, D. Conyngham, president of the said Commercial and Railroad Bank of Vicksburg, by virtue of the authority in him vested by an order or resolution of the board of Directors of said Bank, hereto affixes the common seal of said Commercial and Railroad Bank of Vicksburg, for and on behalf of said corporation ; and he, by virtue of the authority in him vested, hath affixed the common seal of said corporation to this deed, as the act and deed of the said corporation, and as evidence thereof he also hereto subscribes his own name, and the said parties of the second part have also hereunto set their hands and seals this day and year aforesaid. { Seal of } D. Conyngham, President.
Witness, { bank. } W. W. Frazier, (seal.)
. J. G. Bibby,
R. R. Robinson.

" This indenture, made and entered into on this the thirteenth day of February, in the year of our Lord one thousand eight hundred and forty, between the President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, of the first part; William W. Frazier, Thomas E. Robins, and William S. -Bod-

ley, of the second part; and the various other persons and corporations, creditors of the said Commercial and Railroad Bank of Vicksburg, who shall be deemed parties to this instrument in the manner herein-provided, of the third part, witnesseth:

"Whereas, the embarrassed situation of the President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, and the present inability of its debtors to meet their liabilities, place it out of the power of said corporation to complete the railroad, or to pay its debts, without having time to make collections; and whereas, the unprecedented pressure which now rests upon the community, and the utter impossibility for said corporation to collect its debts immediately, without being destructive to the interests of its debtors, by causing a great sacrifice of their property, and without being destructive, also, to the best interests of the corporation, as such sacrifices on the part of its debtors will wholly disable them from complying with their engagements to said bank; all of which causes render it necessary (in order that justice may be done to all the creditors of said corporation, and in order to complete the railroad, which was the great and primary object for which the charter was granted), that an assignment of the property, debts, and effects of the said corporation, should at once be made for the benefit of the creditors, as will most effectually promote the interest of the creditors of the institution, and protect its debtors from loss and sacrifice, and at the same time furnish means to finish and complete the railroad immediately, and to protect and secure to the stockholders of the said road the franchises granted by the charter.

"Now, to effect the purposes aforesaid, this indenture witnesseth: that the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, in consideration of the premises, and of five dollars to the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, in hand paid, by the parties of the second part, the receipt whereof is hereby acknowledged; and further, in consideration of the covenants, stipulations, and agreements herein contained, have given, granted, bargained, sold, assigned, and transferred and set over, and, by these presents do give, grant, bargain, sell, assign, transfer, and set over to said William W. Frazier, Thomas E. Robins, and William S. Bodley, and to the survivors of them, the said William W. Frazier,

Thomas E. Robins, and William S. Bodley, and to the heirs, executors, administrators, and assigns of such survivor, all the property, real, personal, and mixed, which, either in law or equity, belongs to the said party of the first part, to wit : its real and personal estate of every kind and description, situate in the county of Warren, and State of Mississippi, or elsewhere ; its stocks, goods, wares, merchandise, bills receivable, bonds, notes, book accounts, claims, demands, judgments, choses in action, and all of its property of every kind and nature, whether enumerated and specifically mentioned or not. And the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, for the consideration aforesaid, do also bargain, transfer, and assign to the said William W. Frazier, Thomas E. Robins, and William S. Bodley, and to the survivor of the said William W. Frazier, Thomas E. Robins, and William S. Bodley, and to the heirs, executors, administrators, and assigns of such survivor, all the surplus profits hereafter arising, or which may hereafter accrue from said railroad, from and after the time said road is finished and completed to Jackson ; that is to say, all profits which may thereafter be received over and above the necessary expenditures and disbursements of the road, including officers' salaries, &c., are to be received by said assignees ; and only such profits as may arise after the completion of said road are to be received by said assignees ; and, in order the more effectually to carry this provision into effect, the said trustees, or any hereafter to be appointed, are hereby declared to be the joint agents of the party of the first part, and of all the creditors of said corporation ; and, as such agents, said trustrees are hereby authorized and empowered to take possession of said road and control the same, for the purpose of finishing and completing the same, and to receive the profits and issues thereof ; provided, however, that the horses, slaves, wagons, carts, mules, oxen, iron, engines, and implements of every kind now used in working on and constructing the railroad, are not thereby intended to pass to said assignees, and are hereby excepted out of the provisions of this deed : to have and to hold to the said William W. Frazier, Thomas E. Robins, and William S. Bodley, and to the survivor of the said William W. Frazier, Thomas E. Robins, and

William S. Bodley, and to the heirs, executors, administrators, and assigns of such survivor ; in trust, however, for the following uses and purposes, to wit : that the said William W. Frazier, Thomas E. Robins, and William S. Bodley, shall proceed in the manner that they may deem most for the interest of all concerned, to sell and dispose of, either at private sales or by auction, and to execute good and sufficient deeds, bills of sale, releases, and all other instruments of conveyance to effect a sale or transfer of the real and personal estate, goods, and stocks of said party of the first part herein conveyed, to such person or persons, and for such prices, as in their judgment may appear best for the interest of all concerned, and to collect and hold the proceeds of such sales, and also to collect and realize in money, the most that may be practicable from the bonds, bills of exchange, bills receivable, notes, claims, accounts, judgments, demands, choses in action, and profits of said railroad, from and after the time of its completion to Jackson, hereby transferred and assigned to them : provided, however, that said trustees shall in no case refuse to receive from debtors to said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, the bank-notes, checks, post-notes, certificates of deposit, and bills receivable, due from said bank or any of its branches, in payment of debts due to the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg ; provided, such debtor or debtors shall give sufficient security for the amount of his, her, or their liabilities, within twelve months after the registration of this deed of trust : and it is further stipulated, that, in all cases where security is not given as contemplated by the provisions of this deed of trust, by any of the debtors to said bank, it shall not be compulsory on said trustees to institute suit immediately; but said trustees are hereby empowered to sue for, to renew or give further indulgence, or to compromise or settle said debts, in such manner as will best secure the same, and upon such conditions, as in their judgment will be for the interest of the creditors of said bank. And said trustees are hereby declared to have power, in all cases of doubtful debts, to compromise and settle the same upon such terms as they may deem best for all parties.

And, from the proceeds of such sales and collections, the said

trustees and the survivor of them, shall pay all just and reasonable
expenses and charges of making and carrying into full effect this
assignment, and the objects thereof ; in doing which, the said trus-
tees are hereby authorized, according to their discretion, to employ
one or more attorneys, agent or agents, who shall by them be paid,
out of such proceeds, a reasonable compensation for their services.
And it is further stipulated, that the said trustees shall retain for
themselves, out of said proceeds, as compensation for their labor,
trouble, and responsibility in the premises, at the rate of eight thou-
sand dollars each per annum ; which sum shall be in lieu of all
commissions, and be a full compensation for their several services ;
and, out of said proceeds, shall also pay all the necessary expenses
of the said President, Directors, and Company of the Commercial
and Railroad Bank of Vicksburg, in the management of said cor-
poration ; and the residue of the proceeds of such sales and collec-
tions, and the profits arising from said railroad, from and after its
completion to Jackson, shall be considered as the net avails or
proceeds of the property, profits, and effects hereby assigned.

" And whereas, it was the principal object of the legislature, in
granting the charter to said President, Directors, and Company of
the Commercial and Railroad Bank of Vicksburg, that the railroad
from Vicksburg to Jackson should be made and completed ; and
whereas, if the said road is not completed within the time specified
in said act of incorporation of said President, Directors, and Com-
pany of the Commercial and Railroad Bank of Vicksburg, the
charter will be forfeited, and the said road, as far as it is now made,
will also be forfeited, and the profits thereof, which will eventually
enable the said President, Directors, and Company of the Com-
mercial and Railroad Bank of Vicksburg, to pay their liabilities,
will be wholly lost to the creditors, — therefore, with a view to
prevent irreparable injury to the creditors of said President, Direc-
tors, and Company of the Commercial and Railroad Bank of
Vicksburg, it is hereby stipulated and agreed, that the aforesaid
trustees shall, and they are hereby declared to have the power,
and it is hereby made their duty, to borrow, in the name and on
behalf of said President, Directors, and Company of the Com-
mercial and Railroad Bank of Vicksburg, from any person or per-

sons, corporation or corporations, such sum or sums of money, as may be necessary, to complete said railroad to Jackson, provided said sum or sums of money, so to be borrowed, shall not exceed the amount of two hundred and fifty-thousand dollars ; and should said sum of two hundred and fifty-thousand dollars, or any part thereof, be borrowed, the property and effects hereby conveyed and assigned are to be bound for the payment of the same, with all interest thereon. Therefore, in the first place, out of said net avails or proceeds, the said trustees or the survivor of them, shall pay off and discharge, in preference to all other claims or demands, such amount, not exceeding the sum of two hundred and fifty-thousand dollars, as may be borrowed by said trustees, from any person or persons, corporation or corporations, for the purpose of completing the railroad to Jackson. And, secondly, the said trustees, from said net avails or proceeds, which shall remain after the payment of said loans, if so made as aforesaid, for the purpose of finishing and completing said railroad, shall pay all the just debts, balances, and sums due, from the party of the first part, of every kind and description, and for the payment of which, the party of the first part is legally liable : provided, however, that no stockholder, who has paid in his stock, or any part thereof, shall be considered as a creditor, within the meaning of this deed of trust, for such stock so paid in as aforesaid ; and should the remainder of said net avails, or proceeds, not be enough to pay off all the debts and liabilities of said party of the first part in full, then the same shall be by said trustees applied in such manner as to pay off *pro rata*, or in equal proportion, to the amount of each debt or claim ; and should there be a balance, after payment of all the debts due by said party of the first part, then such balance is to be paid to said party of the first part ; provided, however, that no creditor of the said party of the first part shall be entitled to be paid any part or portion of the net avails or proceeds aforesaid, except upon the terms and conditions hereafter stated. And whereas, it will be necessary for said trustees, in order to prevent a large accumulation of the net avails or proceeds as aforesaid, remaining upon their hands, to make stated dividends or apportionments among the creditors ; and whereas, it is necessary for said trustees,

when such dividends or apportionments are made as aforesaid, to know the amount of the indebtedness of said party of the first part, and to whom indebted ; therefore, it is stipulated, and it is hereby made the duty of said trustees to make publication, in such manner as will afford information to all creditors, and thereby notify all the creditors of said party of the first part, to file their claims, judgments, bills, bonds, notes, or other evidence of indebtedness, with said trustees or either of them, within twelve months from and after the registration of this deed of trust ; and all the creditors of the said party of the first part, who shall so file their debts or claims as aforesaid, shall be considered and taken to be parties to this deed of trust ; and at the end of twelve months from said registration, all the net avails or proceeds, after first paying the loan, should it be made, to complete the railroad as aforesaid, shall be divided equally, in proportion to the amount of each debt, among all creditors who have filed their claims as aforesaid. And said trustees shall, every six months thereafter, divide and apportion, *pro rata*, whatever net avails or proceeds may be on hand, among said creditors ; provided, however, that any creditor or creditors, who has not filed his, her, or their claims, or claim as aforesaid, may file the claims or claim, at any time afterwards ; but in such case, such creditor or creditors, shall only be entitled to a *pro rata* share of the succeeding dividends. And whereas, many debts or claims may be presented which are of doubtful character, or which may not be legally just, or which may have been paid, or which may otherwise be inequitable ; therefore, no claim or demand (other than the bank notes, drafts, bills of exchange, and certificates of deposit, of said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg) shall be considered as received, or filed with said trustees ; nor shall any claim or claims, other than those above enumerated, or any part thereof, be paid by them, unless the board of directors of said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, or a committee appointed by them, shall approve the same, by indorsing the same as valid : and it shall be the duty of each and every creditor or claimant, before filing his or her claim with said trustees, to present the same (unless the claim consists of bank notes, or drafts, or

checks, bills of exchange, or certificates of deposit, issued by said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, or bonds made and executed by them as aforesaid) to the board of directors of said company, or to the committee appointed by them as aforesaid, for their approval. And in all cases when suit may be brought on any claim or claims, which have been rejected by said board of directors, or said committee, or on which they refuse or neglect to act, if the party or parties who hold such claim or claims shall notify the trustees, that suit has been commenced thereon, he or they shall be considered as a party or parties to this deed, from that time : provided he or they succeed in obtaining judgment against the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg ; and he or they shall be entitled to a *pro rata* share of the dividends from the time of the notification, if, as aforesaid, he or they obtain a judgment ; but it shall be the duty of said trustees to go on, divide the net avails or proceeds in their hands, as herein provided, among all the other creditors, whose claims have been allowed.   But if judgment shall be rendered against said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, in favor of said claimant or claimants, the proportion of said claimant or claimants, shall be applied and paid in full, out of the succeeding dividends, so as to make his or their share equal with all other creditors ; provided, however, that in all such cases, the said trustees, and the claimant or claimants, may submit the matter to *three* arbitrators to be chosen by the parties, whose award shall be final and conclusive.   And the said trustees are to have possession and control of the books, bonds, notes, choses in action, &c., of the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, at the principal bank at Vicksburg, and at the branches thereof, so far as the same may be necessary, for them to collect and adjust ; and the retention of the same, by the said party of the first part, in their banking-house at Vicksburg, and in the banking-houses of the branches of said bank, for the safe keeping of the same, and the convenience of all parties, will be considered as the possession of said trustees, and subject to their control, order, and direction.   And it is expressly agreed, that the acts of a

majority of said trustees, shall be the act of all, and as binding as if all had assented thereto : and the said parties of the second part, covenant, stipulate, and agree to, and with, the party of the first part, and with all and each of the creditors of the said party of the first part, who may become parties hereto, as is hereinbefore provided, that they will semiannually exhibit a statement of their accounts to the board of directors of the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg : and it is further stipulated and agreed, by and between the said parties, that if the trustees herein named, or either of them, die, or refuse to act, then, and in either of said cases, the board of directors of the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, shall have power to appoint any other trustee or trustees in place of such as have died or refused to act, and the said substituted trustee or trustees, so appointed (which said appointment shall be entered on the minutes of the proceedings of the said board of directors of the President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg), shall have all the power and authority of the trustees herein appointed, and shall be subject to all the responsibilities and duties belonging to the trustees, herein particularly named as aforesaid, in this deed of trust : and said substituted trustees shall be entitled to the same compensation as is herein provided to be paid to the said trustees herein named : provided, that in appointing new trustees, the said board of directors of the President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, shall have no power to change, alter, modify, or re-. voke any of the trusts hereby created ; nor shall their failure or omission to appoint a trustee or trustees, when necessary, in anywise affect this trust, but the same may be supplied, if necessary, according to the rules which govern a court of chancery. Nor is the said board of directors to have power or authority in any manner to revoke this deed, or any part of it. Nor shall any appointment, or failure to appoint a trustee or trustees, in any manner give the board of directors of the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, any control over this deed ; and it is hereby declared to be the intention of the

parties to this instrument, that the transfer of all the property, choses in actions, and effects, as before mentioned, is to embrace, and does by these presents include and embrace, all of the property, real and personal, choses in action, effects, &c., of the President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, at Vicksburg, and all their branches; the proceeds of all judgments recovered by the said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, and all claims now in suit and not reduced to judgment, and such as may be in the hands of attorneys for collection, in the State of Mississippi, or elsewhere; and the said claims now in suit, and which may be in the hands of attorneys or agents for collection, are to be prosecuted, and the proceeds thereof, together with the proceeds of such claims as are reduced to judgment, are to be collected and received by the said trustees, and applied in the same manner as is provided herein, for the application of the proceeds of the other property, choses in action, and effects, hereinbefore mentioned; and said claims and judgment, &c., are to be subject in every respect to this deed, and the control of the trustees herein named, as any other claim is subjected to their control hereby. And it is hereby declared, that the provisions of this deed of trust are to apply, in all respects, not only to the principal bank at Vicksburg, but to all of its branches; and this transfer embraces, and is intended to embrace, all the property of the said party of the first part (not herein excepted), whether situated in Mississippi, or elsewhere. But it is understood, that no property, the use of which consists in the consumption, as wood, coal, &c., is intended to be embraced or conveyed hereby; and such property (together with that hereinbefore excepted) is hereby excepted out of the general provisions of this deed. And it is further agreed, that out of the proceeds of the property hereby assigned, the said trustees shall pay any debt or debts, for which any of the property herein assigned is bound, or on which a lien exists, either by operation of law, or by contract; and such property, when so discharged from such lien, shall be, and is, hereby, vested in said assignees, for the purposes of this trust.

" In testimony whereof, David Conyngham, President of the said President, Directors, and Company of the Commercial and

Railroad Bank of Vicksburg, by virtue of the authority in him vested, by an order and resolution of the board of directors of said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, hereto affixes the common seal of said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg, to this deed, for and on behalf of said President, Directors, and Company of the Commercial and Railroad Bank of Vicksburg; and he, by virtue of the authority in him vested, hath affixed the seal of said corporation to this deed, as the act and deed of said corporation; and as evidence thereof, he also subscribes his name hereto : And the said parties of the second part have hereunto set their hands and seals the day and year above written.           { Seal of bank. }    D. Conyngham, President.

    'Witness,                                 W. W. Frazier,    (seal.)
      J. G. Bibby,                    T. E. Robins,    (seal.)
      R. R. Robinson.                  W. S. Bodley,    (seal.)

*W. G. Thompson*, for the defendant in the demurrer.

In arguing this case on the part of the defendant, I shall endeavor to sustain the following positions : First, That a corporation has no power to effect such a purpose as was aimed at by the deeds of assignment, on which the complainants rest their claim in this cause. Secondly, That an attempt is made, by the deeds of assignment, to invest the assignees with several diverse powers and characters, which are wholly inconsistent and contradictory, forming an assemblage and combination altogether unknown to the law, and so involved and intermingled that they must all, of necessity, either stand or fall together; and, Thirdly, That the assignment is of such a character as the law will not sanction nor sustain, as against creditors, either in the case of a corporation, or an individual debtor, in failing circumstances.

Let the nature of corporations in general be briefly considered. A corporation is the creature of its charter; from that it derives its existence, its vitality, and capacities; its powers are limited by the terms of its charter, and it can take nothing by implication, except what may be indispensable to its existence; it is limited in the exercise of its powers to the mode and subject-matter precribed; it

can make no contracts except in relation to the specific purpose and objects for which it was created ; and when the charter prescribes the mode in which, and the particular agents by whom, its powers may be exercised, the corporation cannot act by other agents nor in different modes. The power granted by its charter is a trust deposited with the corporation, to be executed under its own authority and immediate direction, and is, therefore, not assignable. This view of the general nature of all corporations is fully sustained by the following authorities : — *Head* v. *The Providence Insurance Company,* 2 Cranch, 166 ; *Washington and Pittsburg Turnpike Company* v. *Cullen & Crane,* 8 Serg. and Raw. 521 ; *Clarke* v. *The Corporation of Washington,* 12 Wheat, 54 ; *Goggler* v. *The Corporation of Georgetown,* 6 Wheat. 597, 598 ; *Dartmouth College* v. *Woodward,* 4 Wheat. 636 ; *Charles River Bridge Company* v. *Warren Bridge Company,* 11 Peters, 546 ; 2 Kent, Com. 299.

The construction of the railroad was the leading consideration with the legislature, in granting the charter of the Commercial and Railroad Bank of Vicksburg. The charter, in section 4, declares this to be the main object ; and the deeds of assignment state that the construction of the road was the great and primary object of the charter. It is in relation to this object, as the principal subject-matter of the charter, that certain powers are conferred on the corporation, and that the legislature designed those powers should be exercised. It is true, that banking privileges are conferred on the corporation, and the business of banking thus made a distinct subject-matter, in relation to which the institution was authorized to employ its corporate powers ; yet it was the intention of the legislature that the business of banking should be secondary, and auxiliary to the construction of the road. The charter, in section 5, declares that the grant shall be void, if the road be not begun and completed within a time prescribed. And this, evidently, shows the construction of the road to be the main end for which the corporation was created, and for which all its powers and privileges were granted. It is also apparent, from this clause of forfeiture, that it was not the intention of the legislature, that the corporation might exist and exercise its powers separated from, and independent of, the business of constructing the road. The stockholders in this institution were

Robins, et al. *v.* Embry, et al.

not incorporated without reference, in the first instance, to any particular object, nor for all objects, generally, about which they might afterwards choose to exercise their corporate powers, nor for some special leading object, other than the construction of the road — and the privilege of constructing a railroad, subsequently, and by way of further grant, appended to the charter, as an afterthought, as a secondary consideration. The charter plainly points to the construction of the road as the holding principle of the corporation. Take this away, and the corporation immediately falls into a condition in which the legislature never designed it should have existence. For the legislature, certainly, did not intend to create a corporation with mere abstract powers ; and the law is clear, that a corporation cannot exercise its powers, except about the objects for which it was created, which the charter designates.

The construction of the road being essential to the existence of the corporation, it follows, of necessity, that everything, of whatsoever nature, pertaining to the corporation, which is essential to the construction of the road, is likewise essential to the existence of the corporation. And hence, although it is said that property is not, in general, of the essence of a corporation, it is plainly otherwise in this case, since the road could not be constructed without the corporation having the possession and control of capital or property. And as it was chiefly for the purpose of having the road constructed, that the powers and immunities generally of a corporation were granted to the stockholders, so it was for that purpose that a corporate character was given to the property they hold in common. And as the whole charter was made subject to forfeiture, on a failure to construct the road, it follows, that the property belonging to the corporation cannot hold its corporate nature apart from its being subservient to the construction of the road. It is plain that the corporation, mainly and substantially, consists of the privileges, immunities, and powers granted to the stockholders in relation to their common property, to enable them to employ it with peculiar advantages about the construction of the road. Let the nature of this assignment be now considered. The board of directors have relinquished and transferred from the corporation the business of constructing the road, and all the property belonging to the corporation to be devoted

to that object in the hands of the assignees, and have also endowed the assignees with such capacities, as enable them to carry out the leading purpose of the charter, as fully as the corporation might do it, in the exercise of all the privileges, immunities, and powers granted by the charter. In other words, they undertake, by these deeds of assignment, to transfer from the corporators to the assignees everything which is of the essence of the corporation, to substitute them, virtually, under the charter, in the place of the corporators, to constitute them the takers and holders of all which the charter grants. Now, what is the whole essence of an incorporating act ? Every charter is a grant, and necessarily implies a grantee. An act of incorporation is not merely a declaration of certain privileges, immunities and powers, without more ; it includes, likewise, a subject who takes them. It is strictly an enabling act. It is, likewise, *sub modo*, a creative act, which can proceed only from the sovereign power ; it is the giving existence, under a new and uncommon mode, in relation to specific objects, to certain individuals in a collective capacity. And, hence, a corporation is said to be the *creature* of its charter — an artificial being, created by law, having existence and vitality by virtue of the capacities and privileges which the incorporating act bestows on the individuals, who compose it, to be exercised in their collective capacity. An act of incorporation is an enabling act, and operates on the individuals who are the grantees of the charter, the recipients of what the charter bestows. And the creative power, implied in the sense in which a corporation is said to be the creature of its charter, is employed by the legislature, as the depositary of the sovereign power of the State, in the act of conferring on certain individuals such new and uncommon privileges and powers, to be exercised in a collective capacity, as constitute them a corporation. This would appear most plainly, if the incorporating act should specify the particular persons, who were designed to be incorporated. The capacities and privileges bestowed would, unquestionably, be considered personal. The implication would not be raised, that, inasmuch as the legislature had conferred a corporate capacity, for specific objects, on certain persons, as A, B, and C, therefore any other three persons may take and exercise the same. And these privileges and powers cannot,

Robins, et al. *v.* Embry, et al.

with reason, be considered any the less personal, when the incorporating act specifies the terms and conditions on which the benefit it confers may be taken, and points out the particular class of persons who may take it. Those who take the place, and bear the responsibilities, and perform the duties, of stockholders, constitute that class exclusively in this case. Again, every corporation, especially if created for some great public purpose, is made by the act of incorporation the depositary of a special trust. *Clarke* v. *The Corporation of Washington*, 12 Wheat. 54. As it is impossible that the confidence implied in a trust could be reposed in a merely artificial being, the creature of law, without reference to the intelligent moral agents who compose the corporation, it is plain that the corporate privileges and powers are personal.

Hence I conclude that the board of directors, when they substitute the assignees in the place of the corporators, assume to exercise the sovereign power of the State.

As it is manifest that the primary and controlling purpose in this assignment was to carry out the great object of the charter in the construction of the road, so it appears that the board of directors have undertaken expressly to clothe the assignees with all such corporate powers as were necessary for that purpose, — as to take and grant property, to obtain loans, to contract obligations, generally, and to sue (including a liability to be sued) on behalf of the corporation, and to hold in common all the corporate property, in perpetuity. The assignment expressly gives perpetuity to the body of assignees; the right of filling vacancies being reserved to the directory. In order that a body of corporators may have perpetuity, it is not essential that the right of filling vacancies should be in the corporators themselves; it may be lodged elsewhere, as in the case of most *quasi* corporations. Chancellor Kent, in his Commentaries, remarks, that "it was chiefly for the purpose of clothing men in succession with the qualities and capacities of one single, artificial, and fictitious being, that corporations were formerly invented. By means of the corporation, many individuals are capable of acting in succession, like one single individual, without incurring any personal hazard or responsibility, nor exposing any other property than what belongs to the corporation, in its legal capacity." Such, precisely,

was the purpose of the board of directors in this assignment. It will not do to reply, that the corporation still exists, and that it exercises all its powers through the assignees, who are its mere agents. The charter has constituted the board of directors the general agents of the corporation ; and the business of a corporation cannot be legally transacted by other agents, than those who are designated as such by its charter. To this it will not do to reply, that the board of directors is still continued in the corporation, and that their agency is exercised through the assignees, who hold their office by the appointment of the directory. The agents of a corporation, who are designated by its charter, cannot delegate their authority. But the board of directors have not only delegated their authority to the assignees, as sub-agents under them ; they have, by the terms of the assignment, forever relinquished to the assignees all control and authority over the business of the corporation. The positions I have here advanced, respecting the agents of corporations, are fully sustained by the authorities. I refer to Sugden on Powers, Law Library, vol. 13, p. 222, 223 ; *Combe's* case, 9 Rep. 756 ; *Clarke v. Corporation of Washington*, 12 Wheat. 54 ; *Tippetts v. Walker, et al.* 4 Mass. Rep. 597 ; *Emerson, et al. v. Providence Hat Manufacturing Company*, 12 Mass. Rep. 249 ; *Washington and Pittsburg Turnpike Company v. Cullen & Crane*, 8 Serg. and Raw. 521 ; *The Commonwealth v. The Trustees of St. Mary's Church*, 6 Serg. and Raw. 508.

From the necessity of the case, the corporation cannot act, except by agents ; and, if the charter does not designate them, the corporation, in order that its powers may not be ineffective, may appoint its own agents. The board of directors are the mere agents of the corporation, holding their authority under the charter ; and their powers and duties are precisely what they would be, if the charter had designated no agents, and they held their authority solely under the appointment of the corporation. *Bank of the United States v. Dandridge*, 11 Wheat. 78. The board of directors have undertaken here to assign away the business of the corporation, together with all its means of conducting it. I insist, that an agent, whose whole duty and power are limited to the managing and conducting of the business of his principal, has no authority, nor is it any part

of his duty, to change or transfer the business, of which his princi-
pal has confided to him the management alone.

The conclusion to be drawn from this view of the case, cannot
be evaded by replying, that the assignment has merely converted
the means of the corporation into a trust-fund for the payment of
debts, and that the assignees stand, in relation to it, as ordinary
trustees, to whom are confided the custody, and control, and direc-
tion of trust-property.    There is a manifest and material distinction
between the cases.    The end of the incorporating act, is the con-
struction of the railroad.    This was a special trust confided to the
corporation, for the purpose of effecting an important public im-
provement.    In order to the accomplishment of this end, the legis-
lature employed its sovereign power, in constituting the company of
stockholders a corporation, clothing them with such uncommon
privileges and capacities as could be taken and held only from the
sovereign power, and giving to the property, which they hold in com-
mon, the peculiarities of a corporate nature.    How is it possible,
that the conducting of this great work, which required the action of
the sovereign power, should be blended with the duties and the pow-
ers of an ordinary trustee, whose title to the property he holds in
that capacity  is  supported  alone  by  the  direct  and  certain  use
vested in creditors, and who takes the legal title for the single pur-
pose of executing that use ?    The property, in this case, could not
retain its corporate nature, except while the title was in the corpo-
ration ; for it is only this connection with a corporation which gives
to property a corporate nature ; and whenever this connection is
broken, the property loses its corporate nature.    So, in this case,
when the title passed out of the corporation, the property, which
had belonged to it with a corporate nature, became, at once, of the
common nature of property in general.    And, as the property lost its
corporate nature in the assignment, which passed the title out of the
corporation, the assignees took it, divested of its former corporate
nature ; it went into their hands, having the common nature of prop-
erty in general, and subject to the uses to which it was assigned,
like ordinary property.   As the connection of the property with
the corporation, which gave it its corporate nature, was broken in
the act of assignment, the corporation then stood, in relation to

the property thus transferred, precisely as an individual property-holder stands, in relation to property which he has transferred. The case of an assignment of its property in trust by a corporation, for the payment of debts, differs in nothing from that of an assignment made by an individual debtor, for the same purpose. After the assignment, the property can have no more connection with the business of a corporation, in the one case, than in the other. It may, then, pertinently be inquired, Would an individual debtor, in failing circumstances, who happens to be the owner of sufficient property to effect such a purpose, be allowed to assign his property for precisely such objects as are aimed at by the assignment in this case? Where would his trustee find his authority to employ the property, assigned to him for the payment of debts, in conducting the business of a chartered company? Could he substitute himself, under their charter, in the place of that company, and, with the property of the debtor, carry out the objects for which they were incorporated? The assignees, in this case, are made, by the deeds of assignment, at one time, trustees for paying the debts of the corporation; and, at another time, they are made the agents of the corporation, for completing the great object for which the corporation was established. And their counsel, in their arguments in this cause, have given them these two characters; they have noticed them, all along, as being both trustees and agents. If they are really trustees, they must stand, in relation to the corporation and the property of the corporation, precisely as the trustee of an individual debtor would stand, in relation to him and his property. There is but one character of trustee for the payment of debts, known to the law. The relation which they bear to the corporation and the property of the corporation cannot be qualified, or in any way affected, in the smallest degree, by the charter of the corporation. They are not trustees under the charter; they have no connection with the charter; they must look entirely for their powers and duties to the general law respecting trustees for the payment of debts. I said they are made, by the deeds of assignment, both trustees for the payment of debts, and agents of the corporation for conducting its regular and appropriate business, for accomplishing the object for which the corporation was established.

These are separate and distinct, offices ; and there is not, necessa-rily, any connection between them.   The assignees are not the agents of the corporation, in virtue of their appointment as trustees ; nor are they trustees of the corporation, in virtue of their appoint-ment as agents.   If they hold these separate and distinct offices jointly, it must be by separate and distinct appointments.   But, are not these two offices inconsistent, the one with the other ?   And can they be lawfully blended ?   They certainly are blended in this case.   We cannot notice these assignees as trustees for paying the debts of the corporation, without looking, at the same time, to their powers and duties as agents for carrying out the great object for which the corporation was established ; nor can we notice them as agents for carrying out the object of the charter, without looking, at the same time, to their duties and powers as trustees for paying the debts of the corporation.   Now it is certain, the corporation cannot lawfully appoint the complainants to hold these two distinct offices jointly, unless it can appoint them to hold either one of these offices separately, and without the other : that is to say, unless it can make them its agents to carry out the object of the charter, clothed with all the powers of trustees for the payment of debts — or, make them trustees for the payment of debts, clothed with the powers of agents authorized to carry out the object for which the corporation was established.   Now, in virtue of the one appoint-ment, these assignees have the control and direction of the entire business of the corporation ; are authorized to accomplish the object for which the company was chartered : say, if you please, as the mere agents of the corporation : and, in virtue of the other appoint-ment, they hold the title to all the means which the corporation pos-sessed for accomplishing that object, and are independent of all in-terference, on the part of the corporation, in the management and application of those means.   Now, these several powers and duties are all blended together in the agency (as it is termed) of these as-signees : as much so, as if they were made the agents of the cor-poration by the deeds of assignment, without any provision for the payment of debts.   Now, I ask, is it possible to conceive of any mode, by which the corporation could more effectually transfer and relinquish the business, and the duties, and the privileges, and the

Robins, et al. *v.* Embry, et al.

powers conferred and imposed upon it, together with the trust deposited with it ?   Objections cannot be evaded, by saying that, for one purpose, the assignees are agents, and that for another purpose, they are trustees.   The two characters and the two offices are blended together in one person.   The same person, who has the control and direction of the entire business of the corporation, as an agent, holds, as a trustee, the title to all the property which can be employed in accomplishing the object for which the corporation was established ; and, as a trustee, is independent of all interference on the part of the corporation.   Let this be called an agency, if it must be so : I ask, are the assignees the agents of the corporation in any other way, than as the corporation is the agent of the legislature ?   It is to no purpose to inquire, what the assignees may be lawfully authorized to do as agents, and what other things they may do as trustees.   As trustees to pay debts, they cannot be authorized to carry out a great work for which it was necessary a charter should be granted : as the agents of a corporation, they cannot hold the title of all the corporate property, nor have the control and direction of the entire business of the corporation, in absolute independence of the corporation itself.

That the property of every debtor is directly and immediately subject to the claims of all his creditors, as soon as they become due, is the first great principle of the common law, in relation to contracts.   On this perfect principle of justice and morality, as a broad and settled basis, are founded all the municipal regulations touching contracts of every country, which has adopted into its jurisprudence the general principles of the common law.   The creditor, it is true, is not allowed to decide for himself upon the justice and legality of his own claim, and to seize unceremoniously on the property of his debtor for payment.   For the just protection of debtors, the law has wisely erected tribunals, and ordained certain appropriate forms for ascertaining the validity of claims. The delay interposed by these forms is precisely that which is deemed necessary and right to be allowed the debtor, to enable him to prepare his defences.   There is nothing limited with more precision, than the time which is allowed the debtor for this purpose.   Excepting the time, which the law interposes, thus exactly

Robins, et al. *v.* Embry, et al.

limited, and for this single purpose the property of every debtor is liable immediately and directly, without any delay, for the payment of his debts. But it is said that the debtor is allowed to assign his property, *bonâ fide*, in trust for the payment of his debts, and yet every assignment for this purpose is, to some extent, a hindering and delaying of creditors. For what purpose, I ask, by what rules, and to what extent, has the great principle of the common law been relaxed in such cases? Common assignments in trust, are clearly an innovation upon the strict rules of the common law, and have been brought into use comparatively within a few years past. They were treated at the beginning as purely creatures of the courts of equity. And on what principle have they been sustained and encouraged? Certainly, not on any principle conflicting with the first rule, and the very foundation, of the common law. A court of equity will never screen a debtor's property from the ordinary course of the common law, for the purpose of giving delay, whatever use such delay may serve, be it even to prevent a sacrifice of property. Courts of equity at first sustained such assignments on the ground that they operated to secure an equal distribution of the insolvent's property amongst his creditors, on the principle that equality is equity. This privilege or indulgence to the debtor was presently extended, so as to embrace and combine with it another principle; that is, of making a preference among creditors. And although these two principles seem to be entirely contradictory, yet the latter soon found favor with courts of equity, on the ground that the debtor, possessing an intimate knowledge of the relative equities of his creditors, can make a more just distribution than the law. To enable the debtor to exercise the privilege of placing all his creditors on an equality, or of making preferences among them, some delay must necessarily be allowed. But beyond this object, equity does not relax, or in any way qualify, the strict rule of the common law. The authorities cited by the complainants' counsel, for the purpose of showing that creditors have not been unreasonably delayed by the assignment in this case, point to the time which may be allowed for beginning to execute the trust. Some time must necessarily intervene between the making of the assignment, and the distribution of

the property.   The correct rule, as to the extent of time to be al-
lowed in such cases, is briefly stated by Mr. Justice Washington, in
*Pierpont* v. *Graham*, 4 Wash. Rep. 200; and by Mr. Justice Story,
in *Halsey* v. *Whitney*, 4 Mason's Rep. 413.   The former remarks,
that the object is to give the creditors time enough to learn all the
facts of the case, and make up their minds.   The latter says,
" In all cases of this nature, a reasonable time must be allowed
for the creditors to come in under any assignment.   What is rea-
sonable time, is matter dependent upon the particular circumstances
of each case."   It is not objected that unreasonable time is al-
lowed the creditors to come in under this assignment.   The cir-
cumstances of the case would not admit of less time than twelve
months for that purpose, and to enable the debtor to exercise the
privilege of ordaining the order in which the creditors shall be
paid.   But are the creditors, in this case, hindered and delayed in
their demands, only for that purpose, and to that extent ?   Certainly
not.   The fund provided by this assignment, for the payment of
debts, is the future profits of the road.   This is to postpone cred-
itors to an indefinite period.   The construction of the railroad is
purely a scheme of speculation ; it may prove to be an unfortunate
one.   After paying annually twenty-four thousand dollars to the
assignees, and defraying the expenses of constant repairs, it may
be a half century, it may be a thousand years, before the debts of
the corporation will be paid out of this fund.   The corporation
cannot alienate the railroad ; it is a species of property which is not
the subject of bargain and sale, on account of the interest the pub-
lic have in it, and the special trust confided to the corporation,
for the construction and the control and preservation of the road ;
and creditors can never resort to it for satisfaction of their claims.
Equity will never so far alter the fundamental principle of the com-
mon law, as to allow an insolvent debtor to lock up his means in
some intangible estate, and to hold off his creditors indefinitely,
dependent upon the proceeds of such estate for the payment of their
claims.

   A debtor cannot prevent his property from being subjected to the
payment of his debts, by merely shifting the legal title.   Nor can
he, as against creditors, convert any portion of his property into a

trust fund, set apart and consecrated to any special object, except that object be the single and direct one of paying debts. A failing debtor can assign his property in trust only for the purpose of securing the privilege which the law allows him, of placing all his creditors on an equality, or of making preferences among them. Before judgments recovered against him, he may sell his property, and apply the proceeds to the claims of such creditors as he may select ; or he may discharge the claims of selected creditors by a direct transfer of his property to them. It-is on the same principle that the law allows him, instead of making a direct and absolute transfer of his property, to selected creditors, to transfer the use to them, assigning the naked legal title to a trustee, with power to execute the use. And the transfer of the use, in the latter case, must have the same degree of certainty as the law requires in the former. It is strictly by 'virtue of the property being devoted to the payment of debts, as fully as if a direct and complete transfer had been made to the creditor, that it takes in the hands of the trustee, who holds the naked legal title, all the peculiarities of a trust fund. It is because the use has gone from the debtor, and become vested in the creditor, that the trustee can protect the property while he executes the use. The trustee's power over the property is supported altogether by the use, which is vested in the creditor ; it can rest upon nothing else. If the use is not a valid one, neither is the title. If the use has not that degree of certainty which the law requires to ascertain the title to property, the legal title in the trustee is void ; and the use must be ascertained and declared at the time the trustee takes the legal title, otherwise there will appear nothing to support it ; for as the use is protected by the title, so the title is supported by the use. The legal title in the trustee is only a means, an instrument, to serve the purpose of the use. It is limited by the use, and cannot extend beyond it. It has no force nor vitality for anything, except that to which the use calls it. It was made to follow the use.

Does the assignment in this case confer on the assignees only such powers as are necessary to execute the uses of the property, as vested in the creditors of the corporation, and devoted exclusively and directly to the payment of debts ? I think not. It is

plain, by the language of the deeds, that the first and principal object was to provide a sure means of effecting the construction of the railroad ; and it is expressly stated, that the profits of the road, after its completion, are to constitute the fund for the payment of debts. The assignees are directed to proceed to collect the debts owing to the corporation, and to make sales of the property, both real and personal estate, belonging to the corporation, at their discretion, and to apply the proceeds of such collections and sales, in the first instance, to the construction of the road, and not to the payment of debts, until after the completion of the road. And let it be observed, that the property, which the charter authorizes the corporation to take. and transfer, is expressly declared to be such as may be necessary to carry into effect the main object for which the charter was given. And so, when the assignees are directed to continue the construction of the road, and to retain possession and control of the road after its completion, until out of the profits all the debts shall be discharged, they are thereby directed to retain all the corporate property in their possession, for the same purpose, and the same length of time. Hence it is manifest, that the payment of debts is not the direct, primary, and leading purpose of this assignment. The whole interest of the corporators, in this matter, was to carry out the main object of the charter. For if that should fail, the charter itself must fall, and with it all the benefits it conferred. The main object of the charter was the construction of the road ; and that is the leading purpose of this assignment. To that object the assignees are directed to devote, in the first instance, all the property belonging to the corporation. The corporators evidently looked for their greatest interest under the charter, to the construction of the railroad, as an unalienable, intangible, and perpetual source of income ; and it is very plain, that, by this assignment, they adopted the most direct and complete method of protecting and securing their entire interest ; that this was the primary and leading purpose of the assignment, the work first to be accomplished by the assignees, and to which the entire means of the corporation were to be applied ; and that the consideration of the creditors' interests was set in the background of this scheme, far behind the other greater and paramount consideration.

All the means of the corporation are devoted, in the first instance, exclusively to protect and firmly establish the entire interest of the corporators, as fully as if there were no debts to be provided for, whilst the creditors are postponed to an uncertain and indefinite period, held off for the affairs of the corporation to take the ordinary course of business, as though there were no compulsory power in the law. The case differs in nothing from that of an individual holder of a large property, who, on becoming embarrassed, should make an assignment of all his means to certain trustees for the purpose, in the first place, of investing the whole, or the larger portion of his property in some great scheme of speculation, or of erecting therewith some extensive manufacturing or other productive establishment, directing the trustees to superintend and control the business, and, after defraying the expenses of a host of necessary agents, to apply the profits of the establishment, as they should arise, annually or semiannually, to the payment of his debts, and to retain possession of the establishment, until all his debts should be paid off, out of the profits. Would not the interest of the debtor be considered the leading purpose of such an assignment? A failing debtor cannot provide for his own interest, by a deed of trust, except as subsequent and secondary to the interests of his creditors. In this case, the interests of creditors are deferred and made secondary to the interest of the corporators. And the legal title of the property vested in the assignees is supported, if at all, principally by the use reserved to the corporators. But it is the use which is vested in the creditor alone, that supports the legal title in the trustee; and that use cannot extend the legal title beyond itself, so as to make it cover another distinct and independent use.

But it is said, that the assignees are directed to appropriate the profits of the road to the payment of the debts of the corporation, and that thus the creditors take, ultimately, the use of all the property which is devoted to the construction of the road. I contend, that it is no more within the power of the corporation to assign away the profits of the road, than to alienate the road itself. The interest which the State, or public, has in the road, is of the nature of an incorporeal hereditament; but the road, in respect of the

property which the corporation has in it, is real estate, and the title is a fee-simple. The charter declares that the corporation shall hold and possess the land, purchased for the site of the road, in fee-simple. The property of the corporation in the road cannot be distinguished and separated from the property it has in the land, which forms the site of the road. There is no distinction, in law, between a grant of the profits of land, and a grant of the land itself. A grant of the profits is a grant of the land. Cruise's Dig. 4, p. 284; 1 Inst. 4, b; Co. Litt. 46; Plowden's Rep. 524; 1 Saund. Rep. 186, c; *Doe v. Brasier*, 5 B. & A. Rep. 125; *Green v. Belcher*, 1 Atk. Rep. 506; *Trafford v. Ashton*, 1 P. Williams, 418. It will be observed, that the use and occupation accompany the profits of the road in this assignment. It is impossible that anything more can be wanting to pass the entire property of the road. But how can the corporation grant the profits of the road, together with the use and occupation, when it has no power to grant the road ? It is an impossibility, in law, that the corporation may have the property of the road, while the assignees take the profits in trust for the creditors. But allowing, for argument, that the corporation retains the property of the road, it is certain that the assignees, at the least, have the usufruct; nothing less can be included in a grant of the profits. But is such a thing known in the law, as that a man may grant the use of his land to another, and yet hold the land himself ? If such a conveyance were good, the statute would, unquestionably, execute the use. No case could be brought more fully within the statute of uses. This cannot be regarded as a covenant to stand seised to uses; because, the only consideration that can support a covenant, to stand seised to uses, is wanting here. And the statute always executes the use where there is a covenant to stand seised. Here is an impossible condition of title, for another reason, even upon the supposition that the corporation holds the property of the road. Let it be granted, that the assignees have taken only the use, which they hold in trust for the creditors, and that the fee, or property of the road, remains in the corporation. What is the conclusion ? There arises a clear case of a use limited on a use; which, so long ago as the decision of *Tynell's* case, was ruled to be void. At the most, this can only

be regarded as a personal covenant, on the part of the corporation, that the creditors shall have the future proceeds of the road. Is there a sufficient consideration here to support a covenant? And can the personal covenant of an insolvent debtor be deemed sufficient to hold off his creditors from pursuing their remedies at law upon his property?

I think I have now shown that so much of the property of the corporation, as the assignees are required to appropriate to the constructing of the road, has not been, directly or remotely, assigned to the creditors; that to that extent there is a reservation in favor of the corporation. It is manifest that a very large proportion of the property, belonging to the corporation, was required for the completion of the road. Furthermore, the assignees are required to defray the expenses of the corporation out of the property assigned; and the creditors have not the meagre satisfaction of knowing what amount is intended to be appropriated in this way. The provision in reference to this object is indefinite and vague, and left open to be ascertained and settled between the corporation and its agents — as the assignees are several times expressly styled in the deeds, and in reference to some of the most important powers conferred on them. The corporation has reserved the power of filling all vacancies that may occur in the body of assignees; and in the exercise of this power, it may exert over the whole property a controlling influence most injurious to the interest of the creditors. Quære, does not this reserved power, to vest the title of the property in the future appointees of the corporation, necessarily imply a power to take back the property, upon the death or resignation of the assignees? And does not this render the whole assignment invalid, as against dissenting creditors, for not being absolute and unconditional? The reservation of this power over the title of the property may justly be regarded as a confirmation of one of the views, which I have already presented of the character of this assignment, as showing it to be illegal and invalid, that is, that the corporation is attempting, by means of the assignees, as its mere agents, to exercise a full control over all its property, in employing it about the objects for which the corporation was created, — thus exercising a power which the charter does not give, and holding off the creditors by the inter-

position of a mere name.    Again, the assignees are directed to bor-
row, in the name of the corporation, a large sum of money, two
hundred and fifty thousand dollars, to mortgage the property of the
corporation for the payment of it, and to apply this sum to the direct
benefit of the corporation.    What is this but a reservation of a con-
trolling power over the property to that amount, to be exercised by
the corporation, through the agency of the corporation?    Several
cases have been cited, in argument, from the books, to show that a
failing debtor, assigning his property for the payment of debts, may
authorize the trustee to make appropriations, and to borrow money,
for the purpose of completing any improvements, and other works
of that nature, which had been undertaken by the debtor, when it
would manifestly be for the interest of the creditors by enhancing
the value of the whole trust fund.    The attention of the Court has
been directed to the case of the Hat Manufacturing Company, re-
ported in Serg. and Raw., in which the trustee was directed to pur-
chase additional articles, and have them worked up with the stock
of materials on hand ; and other cases of assignments of a like na-
ture, which have been sustained.    Granting it may be shown that a
failing debtor has been allowed, in some cases, to exercise over the
property he has assigned a power so dangerous, if indeed not un-
warranted by sound principle, there is no resemblance or analogy
between any case, which can be cited for that purpose, and the case
before the Court.    In all such cases, the whole of the assigned
property, including the portion for which appropriations were au-
thorized to be made, was directed to be sold for the payment of
debts.    But here the appropriations complained of are for the con-
struction of the road, which cannot be sold, neither by the trustee
nor by the process of the law, nor can the corporation alienate it.
An assignment in trust for the payment of debts cannot be sustained,
if the debtor reserves to himself the use of any portion of the prop-
erty, nor unless he relinquishes, by the terms of the assignment, all
power of control over the property.    For all such reservations must
be, in the very nature of things, inconsistent with a transfer of the
title to a trustee, to execute the uses of the property, as vested,
directly, absolutely, and unconditionally, in the creditors.    The
title, which is held by the trustee, can be supported by nothing else

than the uses of the debtor's property vested in his creditors ; if it is not supported by that, entirely and exclusively, it must fall.

I contend, further, that this assignment cannot be sustained, as an assignment in trust, for the payment of debts, or for any other purpose whatever, for want of a sufficient description of the property intended to be assigned. Numerous cases have been cited by the complainants' counsel, to show that a schedule of the property is not indispensable in an assignment for the payment of debts. It will be found, I think, after a full examination, that in all the cases on this point, which are entitled to any weight of authority, it has been decided that an assignment in trust is void, unless accompanied either by a particular schedule of the property assigned, or by marks of identity by which it may readily be recognized, or unless there is, at the least, an express stipulation to furnish a schedule, as soon as may be done after the execution of the deed, in order that creditors may, within the time allowed them for coming in under the assignment, have all necessary information of the amount and description of the property assigned. Here the creditors are left wholly in the dark on that point. I understand the reason of the rule requiring a schedule in these cases to be, that creditors may be furnished with all practicable means of judging of the fairness of the transaction, and of making up their minds whether they will assent or refuse to come in, and that the trustees may be held to an exact account of all the property they received. By the assignment the creditor is cut off from the ordinary, direct recourse, which the law gives him, on the property of the debtor. The debtor is permitted to set apart his property, in the hands of a trustee, for the sole use and benefit of his creditors. The trustee takes it covered with the interest of the creditors. And shall it be said that the creditors may be held off from all knowledge and inspection of this their interest, while it is managed for them exclusively by the debtor and an agent of his own selecting ? How could that be considered an equitable and reasonable substitute and exchange for the direct recourse, which the creditors had on the property of the debtor ? How could that be treated, at all, as a mode of providing for the interests of the creditors ? Allowing that the trustee is disposed to act with fidelity towards the creditors, he is compelled to trust alone

to the honesty of the debtor in disclosing and delivering up the property assigned. And if the creditors are not furnished with the means of ascertaining what amount of property has passed into the hands of the trustee, how can they ever provide any ground or data for proceeding to hold him accountable for the manner in which he executes the trust ? They are told to resort to the court of chancery. The doors of chancery are never open to those who come groping in the dark. Nor will the suggestion be tolerated, that a debtor may cut off his creditors from direct recourse on his property at law, and compel them to put up with such means of looking after their interests as may be extorted, through a court of equity, from the reluctant conscience of the debtor, and whatever agent he may be pleased to interpose between his property and his creditors. This, indeed, would often prove a more successful method of hindering and delaying and defrauding creditors, than ever a debtor would have the boldness to attempt by express provisions in the deed of assignment. The correct rule, as to the time to be allowed in such cases, as stated by Mr. Justice Story and others, I have already mentioned, that to enable the debtor to exercise his privilege of, placing all his creditors on an equality, or of making preferences among them, a reasonable time, which is a matter dependent on the circumstances of each case, is necessary for giving the creditors an opportunity to make up their minds about coming in under the assignment. And how can they do this, without being furnished with some certain means of informing themselves concerning the nature and extent of the provision, which the debtor has made for their interests ? The means of obtaining such information should be furnished equally to all the creditors, without distinction. But if there be nothing in the deed, or accompanying it, to point out the property assigned, and the creditors are compelled to resort for information to the debtor and his agent, it lies in their power to influence the determination of the creditors, according to their own purposes, by making disclosures of one character to favored creditors, and of a different character to all others, and thus to retain, perpetually, the power of making preferences ; which, of itself, would render the assignment void, whether this power be reserved to the debtor himself, or be conferred on the trustee. It is said, for the com-

plainants, that in assignments by banking institutions, a description of the property will not be required, on account of the inconvenience arising from its very great variety, &c. To this I have only to reply, that if there be anything worthy of consideration in the views I have here presented on this point, surely the greater the amount and variety of the property assigned, the greater is the necessity of furnishing to the creditors some certain means of informing themselves concerning it.

There is an express reservation in this assignment of so much of the property as may be required to defray the expenses of the corporation. What amount that may be, is known only to the corporation and to the assignees. I think I have shown that so much of the property as the assignees are directed to appropriate to the constructing of the road, has not been assigned, either directly or remotely, to the use of the creditors ; and by all that appears, much the larger part of all the property may have been required for that object. And hence it is very clear, that only a part, and it may be a small proportion, of the property of the corporation has been assigned to the use of the creditors. If a man grants a part of his estate, without description, the grant is void, for uncertainty in the thing granted ; for there is nothing by which it may be distinguished from his other property.

It is said, for the complainants, that the fourth section of the charter, which authorizes the corporation to transfer and alien its property in any way for the purpose of constructing the road, gives to the corporation a full and exclusive power over its property for that object, and creditors have notice of this, as the charter is declared a public law. This is certainly a very strained construction of the terms employed in this section of the charter, which, by a natural and plain construction, gives to the corporation merely the power to trade and contract generally with and concerning its property, in such ways as may be necessary, in order to use it as a capital for the construction of the road, — and not the power to lock it up meanwhile from the reach of creditors. For, since the road is not the subject of sale, this were to give the corporation a power to contract debts, and that on the faith and credit of its property, under the clause in the charter which declares that the corporation

shall be bound for the redemption of its issues, and yet to deny to creditors the right of enforcing payment by a resort to the property of the corporation. The Court will not listen to a proposition which imputes to the legislature a design at once so ridiculous and unjust.

I think I have now shown clearly, that the claim set up by these complainants cannot be sustained, according to the general principles of the law relating to assignments in trust for the payment of debts.

The counsel for the complainants have contended that the building of the railroad was the subject of a contract between the corporation and the government, for the use and benefit of the public ; that this contract was as obligatory on the corporation as any of its other contracts, to pay money or what not ; and that the corporation might lawfully convey its property in trust, to the exclusion of general creditors, to enable it to comply with that contract. There may be some plausibility in this view of the case, but when closely examined, it will certainly be found erroneous and untenable. This is not a mere conveyance of property, for the purpose of securing and appropriating such means as might be necessary for completing the construction of the road. If this were the whole, or the principal object, why did not the corporation make a direct sale or mortgage of its property to some capitalist, who would furnish the desired means ? But that is not, at all, the character of this assignment. The mere transfer of the property to the assignees is only a small and inconsiderable part of it. The leading purpose was to enable the assignees to carry out the object, to do the work, for which the corporation was created, and which the legislature confided as a special and important trust to the corporation. I think I have already shown that the corporation cannot exist separated and apart from the business of constructing and preserving and controlling the railroad. But it was the leading purpose of the assignment to transfer all this business ; and the property was transferred only as auxiliary to that object. The transfer of the property is a mere shadow, and to no conceivable purpose, if considered apart from the transfer of the business of the corporation. It is not true, that the corporation has transferred its *property*, to enable

it to comply with its contract with the State.  The *contract itself* is transferred.   And I think I have already shown, that that which the complainants' counsel consider the subject of a contract between the corporation and the State, is the holding principle of the corporation.   If it be withdrawn, the corporation can no longer stand together.   And the work or business, which forms the subject of this supposed contract, cannot be lawfully conducted by another, nor by any number of persons, because it cannot be performed, as the charter requires, without a grant from the State of such immunities and powers as would constitute them a corporation.

But is this, indeed, a case of a contract between a corporation and the State, in regard to which the corporation may secure the State by an assignment of its property, which places it beyond the reach of general creditors ?   It is said, that the corporation came under an obligation to the State to construct the road for the convenience of the public ; and that the consideration moving from the State, was the corporate franchises granted to the stockholders.  The legislature contemplated the railroad as an object of benefit, equally to the public and the corporation.   The public was to have the convenience of travel ; the corporation was to have the property of the road ; it was authorized to purchase land for the site of the road, and to hold and possess the same in fee simple ; it was to regulate the tolls, and receive all the profits of the road ; it was to have an indefeasible right to the property of the road : the road was to remain the property of the corporation, so long as the corporation should exist ; for, in regard to the construction and the subsequent preservation and control of the road, the corporation was made, under its charter, the special depositary of an important public trust.

The consideration moving from the State, and the benefit to be taken by the corporation, were thus united in the same object.   The State, by a grant of the corporate franchises, secured a benefit to the public ; and the corporation, by effecting a convenience of travel for the public, secured a benefit to itself.   It was only while benefiting the public, that the corporation could take any benefit to itself, under the charter.   It was in the act of using the privileges conferred by the charter, that the corporation was to benefit the

public : in other words, the consideration moving from the State, carried, in itself, the benefit the corporation was to give to the public.   If the corporation failed to benefit the public, it could only be because it failed to exercise the powers conferred on it by the State ; and when it failed to use those powers, there ceased to be any consideration moving from the State ; for, the consideration moving from the State, was the benefit the corporation was to have in the exercise of the privileges and powers granted by the charter. How, then, can this be regarded as a contract, in any such sense as is contended for ?   How can it be regarded *otherwise than* as a privilege bestowed on the corporators, in consideration of the benefit, which would, of necessity, arise to the public, in the use and exercise of that privilege ?   The legislature, by the terms of the charter, made it impossible that the corporate privileges and powers could be exercised, except for the benefit of the public.   There could be no possible inducement to use them otherwise ; for the charter would be forfeited, and the corporation would lose all the property it had acquired, if the railroad was not commenced within two, and completed within six, years.   For, so far from there being an absolute consideration passing from the State, for which the corporation became indebted to the public, in the way contended for, the corporation is subjected to a forfeiture, in the event of its failing to effect the proposed benefit to the public, which would overbalance, in loss, all the benefit it had received by the charter.   In one way it is true, but very different from that contended for by the counsel of the assignees, the corporation did come under an obligation to the government, and, through the government, to the public, in consideration of the benefit bestowed upon it under the charter : an obligation to do the work ; to execute the important public trust specially confided to it, which, by this assignment, is transferred to the assignees.

It is said, that, in consideration of the State's enabling the company to employ their capital stock with certain corporate privileges and powers, the company came under an obligation to construct the road ; that, in respect to this object, the corporation became a debtor to the State, and the State became a creditor of the corporation ; and it might well take a lien upon all the property of the

corporation to secure its claim. The State contributed nothing to the capital stock of the corporation ; and it was only on the condition of constructing the road, that the company received the corporate privileges and powers conferred by the charter : so that, if the road failed to be constructed, the State could lose nothing ; and had, in fact, parted with nothing, neither money nor anything else. But how was the company to effect the construction of the road ? Only by means of the general power which the charter gave it, of trading and contracting on the faith and credit of its capital stock. This was.made a banking corporation ; and the privilege of banking was unquestionably given to facilitate the construction of the road. The corporation was enabled to deal with its own issues, in the place of actual money; and, in all its contracts, it became a debtor to every person dealing with it, on the faith and credit of its capital stock, whether existing in actual money, or in the property which the corporation may have purchased. The corporation was authorized to operate on a capital of four millions, and to issue promissory notes to an amount three times greater than its capital. The position taken by the counsel for the complainants, then, amounts to nothing less than this : the State, although it has parted with nothing, may rightly hold a lien upon all the property of the corporation, for securing the construction of the road for the accommodation and convenience of the public, while individual creditors, who may hold claims to the amount of twelve millions, shall be held off, although their claims may have originated on the faith and credit of that property, and under the sanction of the express guaranty of the charter, which says, that the corporation shall be bound for the redemption of its issues ; and, moreover, notwithstanding these debts were contracted by the corporation, in the course of carrying out the very object for the securing of which the State is represented as having a right to hold a lien on all the property of the corporation, to the exclusion of the general creditors. A mere statement of the proposition is enough to refute it.

*George S. Yerger*, for complainants.

1. The question is well settled, that a corporation, like an individual, may make a *bonâ fide* assignment of its property, for the

Robins, et al. *v.* Embry, et al.

benefit of its creditors, and therein give such preferences as it chooses. And such assignment, although it may disable the corporation from discharging the ordinary purposes of its institution, yet it still remains a living corporation. 6 Gill & Johnston's Rep. 205, 363 ; 6 Conn. Rep. 233 ; 8 ib. 505 ; 5 Peters, Rep. 651 ; 1 Watts, Rep. 385 ; 2 Stewart's Rep. 401 ; Case of Real Estate Bank of Arkansas, in pamphlet.

Its existence, after such assignment, is absolutely necessary ; its name must be used in the collection of debts, judgments, &c., and in suits against it to establish demands which are refused to be paid. Vide same authorities.

And although the intent may actually exist, to prevent a particular creditor from seizing the property and acquiring a lien by judgment, that does not make it fraudulent, if its whole property is devoted to its debts *bonâ fide.* 6 Gill & Johnston, 218 ; 3 Mau. & Selwyn, 371 ; 1 Binney, 516 – 523 ; 4 Mason's Rep. 211, 212 ; *Broshem* v. *West,* 7 Peters, Rep. 313.

And notwithstanding such an assignment may *delay* and *hinder* creditors in their remedies, it is not on that account fraudulent. An actual fraudulent intent must exist, and be proved, or appear on the face of the instrument. 2 Paige's Rep. 490 ; 16 Peters, Rep. 374 ; 9 Pickering's Rep. 410.

2. It is said, in this case, the description of the property is not sufficient. The *deed assigns* all its *property,* debts, &c. All that belonged to it necessarily passed. The trustees may be called on to set out, specifically, the property, &c., received by them, in order to make them account ; but in all cases such description is sufficient. Case of Real Estate Bank of Arkansas, in pamphlet ; 6 Gill & Johnston's Rep. 366 ; 4 Bibb. 289 ; 4 Mason, 206, 218 ; 2 Sumner's Rep. 278 ; 4 Peters, Con. Rep. 684 ; 5 Wheat. 359.

In case of assignments made by banks, no other description can well be given, so numerous are its various notes, bills, &c. But if a part of the property is not described with sufficient certainty, the deed is certainly good for that which is described, and the property levied on in this case is described as all its real property in Mississippi. This is sufficient without further description. 4 Comyn's

Digest (Am. ed.), 154 ; Fait, E. 4 ; ib., Title Grant E., 1, 2, 3, &c.

A grant of all a *man's land,* in a particular county, or State, is sufficient. Comyns's Digest, Fait, E. 4 ; 4 Bibb, 289, *Jackson* v. *De Lancy ;* 13 John. Rep. 537. The latter case was a grant " of all my lands in the province of New York " ; held, that all passed.

Is the deed, upon its face, *fraudulent ?* It is said, it is. 1st, Because it attempts to vest the assignees with inconsistent and conflicting duties. 2d, Because it was a principal object, in making the assignment, to finish and complete the road, and appropriate part of its means in doing so ; that this was appropriating the property conveyed, to its own use, &c. 3d, Because there is no schedule of property annexed to the deed. 4th, Because the uses are not declared in the deed. 5th, Because the, assignees, in regard to the road, are declared, in the deeds of trust, to be *joint* agents of both parties, that is, the creditors and the bank, *and thereby retain a control over the property conveyed.* 6th, Because the bank retained the power to appoint trustees, in place of those who died, or resigned, instead of going into chancery. 7th, Because the property is locked up from creditors an unreasonable length of time. 8th, Because the directory retained the power to ascertain what claims were of value, &c. 9th, That they had the right to compromise doubtful claims. 10th, Because the assignment was made on condition.

Many of these objections do not exist, in point of fact, and those that do so exist are perfectly legal, and sanctioned by the law.

It is admitted, that the two great and leading objects, in making the assignment, were,

1st, To procure means, by a pledge of its property, to finish the road ; and

2d, To devote *all the profits of the road,* when completed, and all its property, to the payment of its debts, giving a preference to the debt created to finish the road, and requiring it to be paid in the first instance.

If these objects, or either, are illegal, then is the assignment

illegal.    If they are authorized by the law, then the assignment is valid.

The want of a thorough knowledge of the common law, as applicable to charters of this kind, has misled the Supreme Court of Louisiana.    Their opinion is based altogether upon erroneous principles ; and the principal cases relied on by that court, and the counsel in this cause, to sustain their objections to the assignment, are wholly inapplicable.

Let us first see the nature of the trust confided to the corporation, and their power over its property, and particularly over the road.    This will explain what is meant by the assignees being joint agents, &c.    The building of the railroad was a great public improvement.    It was the primary object in granting the charter. (See sec. 4 and 5.)    The public have an interest in the road as well as the individual corporators.    Hence, although all its other property is alienable, absolutely, yet this is not : it could not be sold under execution.    13 Serg. & Rawle, 210, 211.

Hence, also, private property could be taken, upon being paid for, because it was taken for public use, in constructing the railroad. 1 Rice's Rep. 338 ; 3 Paige, 45 ; 59th No. Am. Jurist, Jan. 1840, page 434 ; 2 Dev. & Battle, 451.

It was, moreover, the duty of the bank *to finish it*, and keep it in repair.

From this, it is evident the bank could not mortgage the *road* itself, or convey it by deed of trust.    If it could, the mortgage would be foreclosed, and the road sold.    All that it could do, was to mortgage the profits ;   this is all that the creditors in equity could get.

When the profits were only mortgaged, the bank necessarily retained possession of the road ; but it could only keep it up and run its cars, by means of agents, for a corporation can only act through its agents.    If there was no mortgage, the agents who received the money would have to account to the bank.    But after the mortgage of the profits he would have to pay them to the mortgagee, and equity would compel him to do so ;  or, if he paid them to the bank, the bank would have to pay them over.

Now, when the trust was made, and complainants were made

trustees, to receive the profits of the road, this made them agents or trustees of the creditors, to receive from the bank the profits. And the bank, instead of appointing other persons as its agents, to finish the road and keep it in repair, appointed the trustees for that purpose. Hence, they are the joint agents of the bank, and the creditors. They are agents of the bank in finishing and keeping up the road, and retaining possession for it, and they are agents for the creditors, in appropriating the surplus profits — to the payment of their debts.

The deed shows, expressly, that this joint agency only applies to the *road,* and does not extend to any other property. *Vide* page 2 and 3, of the assignment and the supplemental assignment.

The bank, therefore, has possession and control of the road, *by its agents,* for the purposes of completing it : it could not part with the road itself; but it has no *control over the profits ;* on the *contrary, the deed states, as to all the property, profits, &c.,* it has no control whatever.

3. But suppose the bank had no power to create this *joint agency.* Does this render the deed fraudulent ? Not at all. The assignment of all the property and profits is valid, and the mere want of power to constitute the assignees joint agents, or agents for the bank, in nowise impairs the trust, if, in the exercise of the agency, no control is retained over the property assigned. It only proves that the bank must employ other agents on the road, and let them pay over the profits to the assignees. 10 Pet. 360. It is a question of power, not of interest.

4. It is again said, the bank cannot sell or mortgage its privileges, to make the road ; and the case of *Clark* v. *Corporation of Washington,* 12 Wheat. is cited. True, the bank could not sell franchises, but it surely could employ agents to finish building the road. *It now holds the road, and only pays over the profits.* The franchise is not assigned.

The duties, therefore, of the assignees are not inconsistent or conflicting, nor does the *joint agency* of the assignees give to the bank any control or power to revoke any of the trusts.

5. We confidently assert, that no power to alter the trusts, or that any portion of the property shall be reserved for the use of the

bank, exists in this deed. It is said, that the appropriation of $250,000 of its assets, *or rather the power to borrow that much money* afterwards, to finish the road, is appropriating that sum to its own use ; and that a power to create a future liability, &c., makes it fraudulent.

This is not so. The bank had a right to assign the property, to pay existing debts, and also to pay future advances to be made *to carry out the powers and duties enjoined on it, in the charter.* See 4th sec. of charter.

An assignment made to pay existing debts, or future advances, is good. 3 Cranch, 73 ; 2 John. Ch. Rep. 2. The case in 7 Paige, 568, was founded on New York statute, which prohibits this. The bank could legally contract this debt, by its charter, and, if so, it could legally stipulate it should be paid out of the property.

Again : That the bank had the power to convey a part of the property, to borrow money to complete the railroad, cannot be denied. Why could it not, then, authorize the trustees to borrow for it ? If it had power to create the debt, it surely had power to secure it.

Again, the bank or individuals had the power to stipulate that any valuable unfinished property, transferred, should be finished out of the proceeds, and the whole appropriated to pay its debts.

It is said there is no schedule. In partial assignments, when there is not sufficient description of the property, or debts, &c., this has been held to be *primâ facie* evidence of fraud (6 Mass. Rep. 339). But in assignments like this, where all is assigned, and when it is impracticable to have it, it is no evidence of fraud whatever. See case of Real Estate Bank of Arkansas, p. 51 ; 1 Binn. 502, 515, 523 ; 17 Ser. and Ra. 251 ; 3 Mass. R. 252 ; 2 Stew. Rep. 86 ; 8 Pick. 65 ; 6 Gill and Johns. 364, 365 ; 4 Wash. 237.

6. It is again urged, that the deed must be absolute and unconditional ; and so says Sup. Ct. La., and that Court refers to 11 Wend. 202, to support its position. This is untrue, to the extent assumed by the Sup. Court of La. The case in Wendell, only decides where conditions are imposed for the sole benefit of grantor, it is fraudulent (*vide the case*) ; but, that conditions may be annexed, is decided by all the cases, as that certain creditors should be preferred, if they file within such time, &c., &c.

7. The Supreme Court of Louisiana lay great stress on the fact, that if any of the trustees died, others were to be supplied by them. They consider this a *power* of revocation, and refer to 15 John. Rep. 571 ; 11 Wend. 202, neither of which cases supports them. The power there was to *remove* the trustees, and *revoke* the trusts. The power to appoint his own trustees is admitted to exist in the debtor. This power in the deed is qualified, by the express provision, that, in its exercise, they are in nowise to annul or revoke the trusts. 4 Mason, 221.

8. The right of the directors to certify certain claims, is also said to render it void. This, so far from being fraudulent, is directly the reverse. In cases where it was doubtful whether anything was due, as the assignees knew nothing of it, of course the directors were the proper persons to examine the matter ; but their decision was neither to exclude the debt, or prevent it from being filed. It is expressly provided that the party may sue for it, and if he recovers it is to be considered filed, &c.

9. The time in which the property is locked up is not unconscionable, it is only twelve months ; until that time creditors have the right to come in. 11 Wend. 209 ; 2 Paige, 490 ; 4 Mason, 225 ; case of Real Estate Bank of Arkansas, pp. 47, 48, 49.

10. That the power to compromise is valid. *Vide* case of Real Estate Bank of Arkansas, and Story and Kent's opinion thereto annexed ; 4 Rawle's Rep. 207. The dictum to the contrary, in 11 Wend., was the opinion of one judge to two, and the court did not decide on it, page 203, 204, 206.

But in that case it was to compound with *creditors*, here it is *debtors ;* and the objection was, it gave them the right to prefer, &c. *Vide* page 203. This reason does not apply here.

11. It is objected that it is void, because the uses are not declared. 11 Wend. 202, and 7 Paige, 568, are cited. The uses are declared in this case. No power is reserved to declare any future use ; the profits are all applied to the payment of borrowed money, and debts. If this is not declaring uses, I do not know what is.

The decision in La., is based on 15 John. 571, and 11 Wendell. These cases are far from supporting that decision. Nothing is re-

served in the assignment; no benefit is reserved; the road is to be finished; but its profits are given *to the* creditors of the bank.

The Supreme Court of La. say it is a *mere agency:* This is denied. Everything is transferred, that could be transferred; an agent's power may be revoked. Here the powers of the trustees cannot be. No interest exists in an agent.

Here, all the legal interest passed to the assignees. See case of Real Estate Bank of Arkansas, page 43, 46.

As to the power of the directory to examine accounts, &c., *vide* case of Real Estate Bank of Arkansas, 52.

If the power given to the assignees to take possession of the road, and control it for the purposes of finishing it, and receive its profits, was within the power of the corporation, and it necessarily created the assignees joint agents, it was proper and right. If not within its power, the stipulation is void, for want of power; but, surely, this is no evidence of fraud. It is good as to all the balance. 4 Pet. Rep. 360; 15 John. Rep. 571; 2 John. Ch. 2. Otherwise, buildings partially completed, &c., would not be finished, and all parties be injured; this stipulation was for the use and benefit of the creditors. 2 Conn. Rep. 633; 13 Connect. Rep. 382; *Convey. Ex parte*, p. 49; 11 Wend. Rep. 240; 7 Maine Rep. 144. But, if no such power *existed*, it is not a fraud; it is the reverse, if *bonâ fide* intended to be appropriated to the creditors.

The power is, however, expressly given in the 4th section of the charter. By it, they have a complete and exclusive power over the property, *to finish and build the road.* Creditors all have notice of this. The charter is declared a public law. They may alien, sell, or dispose of the property in any way to complete the road, and have the right to borrow for such purpose. 5 Wend. Rep. 602

So far from its being fraudulent, it was obliged to be done, to save the creditors. It was done to save the *franchise granted;* and why? because the intent in *saving the franchise was to save the creditors.* If the franchise was lost, their debts were lost. If the road was not completed in one year the corporation was dissolved, by the 5th section. The act was declared *null and void,* and all privileges ceased. The consequence of which was, that, without

the action of the government, all debts were extinguished (2 Kent's Com. 307).

Again, the contract with the State and public to finish the road, was as obligatory as to pay its debts. It had the right, therefore, to convey property to enable it to comply with its contracts, because, by not doing so, it injured the public and the creditors. This was a contract between the government, for the use of the public and the corporation. The provision in the assignment, to pay " *the necessary expenses* of said President, Directors, &c. of the Commercial Bank of Vicksburg," of course, only means the expenses which the corporation was at in keeping up the road, &c. After its assignment, there could be no *necessary expenses*, save these.

A corporation, after general assignment, although it *exists*, and is a living corporation, yet it is powerless, as to the discharge of the ordinary purposes of its institution. 6 Gill and John. 230.

After the assignment, it could only act in regard to the road, and no expense would be a necessary one, except so far as the road was concerned, and these expenses it had a right to retain. 13 Serg. and Raw. 210.

*S. S. Prentiss* made an argument on the same side, and furnished the Chancellor a full brief (which, by some accident, was lost before the papers came into the hands of the reporters).

*W. Thompson* responded to the arguments of Messrs. Yerger and Prentiss, in an oral speech, but did not make any brief.

CHANCELLOR. On the 13th of February, 1840, the Commercial and Railroad Bank of Vicksburg, by two separate deeds of that date, made an assignment in trust, to the complainants, of all its property and effects, of every kind and description, including the net profits of the railroad when it should be finished. The assignment recites that the embarrassments of the corporation were such, at that time, as to render it unable to either complete the railroad according to its charter, or to pay its debts. The objects of the assignment are declared to be : — 1. The payment of all its

debts.  2. The completion of the railroad, in order to save its charter.  It is also stated, that the accomplishment of this latter object would increase its ability to comply with the former, by applying all the profits of the road to that end.  The trustees are required to sell or dispose of the whole property, as in their judgment may be deemed best for the interest of the creditors.  The proceeds are to be applied to paying the expenses of executing the trust, — the *necessary* expenses of the President, Directors, and Company, in the management of the corporation, and in payment of debts.  The trustees are authorized to borrow in the name of, and upon the credit of, the bank, the sum of two hundred and fifty thousand dollars for the purpose of completing the railroad, and this sum is to be first paid out of the fund assigned.  The trustees are authorized to take the possession and control of the railroad, for the purpose of completing it, and of receiving the profits thereof, to be applied to the payment of debts ; and they are required to exhibit, periodically, a statement of their accounts to the board of directors.  They are authorized to compromise with the debtors of the bank, with a view to the security of the debts, and to the interest of creditors.  They are required to give twelve months to the creditors to come in under the deed, and before any dividend is declared.  They are forbid to receive any claim against the corporation, unless the directors have first pronounced it just.  But a creditor, whose claim is rejected, may then bring suit on it, or by agreement with the assignees, he may have it settled by arbitration, and upon either of these conditions he becomes a party to the assignment.  In the management of the railroad, the assignees are declared to be the joint agents of the bank and of the creditors.  If a vacancy happens in the number of the assignees, the directors of the bank are to fill it ; but if they neglect to do so, the appointment is to be made according to the course of a court of chancery.  It is declared that the bank shall have no power to control, modify, or revoke any of the trusts there declared.  The assignment of the profits of the railroad are without limit as to time.  It is to be inferred, therefore, that it is to continue until all the debts are paid.  This I believe is the substance of the two deeds to which I have referred.  The defendants, being the creditors of the bank, sued upon their claims,

and recovered judgments at law, since the date of the assignment, and had executions issued and levied upon some lots, upon which the depot-buildings are situated, at the *terminus* of the railroad, at the city of Vicksburg.   The complainants filed their bill, setting up the assignment of the property in question to them, and pray for an injunction against the sale thereof, and that they may be permitted to proceed to discharge the trusts with which they are clothed.  The case was submitted upon the general demurrer of one of the defendants to the bill.   It is insisted that the assignment, under which the complainants claim, is void, as well from the want of power in the bank to make it, as from objections arising upon the face of the assignment itself.   Conveyances of this description have but recently come into use in this State, and have not, as yet, so far as I am advised, received a judicial decision in any of our courts; we have no special statute regulating them, nor do they appear to be in any way affected by our insolvent laws.   I am left, therefore, to decide this case by such lights as are furnished by the English decisions, and by the adjudications of the courts of our sister States, upon the subject.   So far as *private persons* are concerned, I do not find that it has been at any time doubted, that an individual debtor may rightfully convey his property in trust for the benefit of *all* his creditors *equally*, — where he divests himself of all control over it, without reserving any use or benefit to himself, and without imposing any sacrifice on his creditor, as a condition to his participation in the fund.   Its integrity and validity cannot be impeached under the statute against fraudulent conveyances, because of its tendency to temporarily delay creditors ; nor because of its effect, in placing the property beyond the reach of process at law.   I can perceive no reason, founded in either principle or policy, why a corporation may not make an assignment for similar purposes, preserving to each creditor the right of sharing *equally*, according to the amount of his claim.   That a bank cannot legally assign its property and effects, to any other purposes than those contemplated by its charter, I readily admit.   But it is surely one of the first duties of a corporation to pay its just debts ; and that it may assign its property for that purpose, is, I think, a proposition too plain for discussion.   It would be strangely incongruous to hold that a bank was bound to

pay its debts, but could not apply its property to that end, in a mode sanctioned as to individuals, without transcending the sphere of its power. But authorities are not wanting upon this point. The cases of *The State of Maryland* v. *The Bank of Maryland*, 6 Gill and Johns. Rep. 205, and the case *Ex parte the Real Estate Bank of Arkansas*, are in support of such an assignment. The assignment in this case is for the double purpose of paying debts and completing the railroad. Authority to sell, transfer, or dispose of its property for the latter object, is expressly conferred upon the bank by the 4th section of its charter. I think, then, that where an assignment is for the benefit of *all* the creditors of the assignor, *equally* and *ratably*, it must command the sanction of every enlightened tribunal, whether it be made by a corporation or a private person. It is a practical enforcement of the maxim, that " equality is equity." And this it would seem was the criterion by which some of the English cases tested the validity of such assignments. In that form, the equitable principles of a bankrupt law are carried out through the medium of a private contract. In the case of *Pickstock* v. *Lyster*, 3 Maule and Selwyn, 371, the opinion of the court seems to have turned upon the ground, that the assignment effected an equal distribution of the property of the debtor, among all his creditors. Justice Bayley said, that, " so far from being fraudulent, it was the most honest act the party could do."

The more recent cases, however, both English and American, especially as to private persons, sanctioned a departure from this principle of equal justice, by sustaining assignments, establishing preferences in favor of particular creditors. And the rule, to that extent, may be now considered as finally settled. *Goss* v. *Neale*, 5 Moore's Rep. 19 ; *Rex* v. *Watson*, 3 Price's Rep. 6 ; *Brewer* v. *Pitkin*, 11 Pick. Rep. 829 ; *Phenix* v. *Ingraham*, 5 John. Rep. 112 ; *Marbury* v. *Brooks*, 7 Wheaton's Rep. 565. The right of a bank, in failing circumstances, to create such a preference among its creditors, rests, I think, upon much more questionable grounds. The question, in this form, is very barren of authority ; neither my own researches, nor those of the learned counsel, have furnished but two cases directly to the point. The first is, the case of *Catlin* v. *The Eagle Bank*, 6 Conn. Rep. 233. The second

is, the case *Ex parte The Real Estate Bank of Arkansas*, which simply adopts and follows the rule laid down in the case from Connecticut. The point did not arise in the case in 6 Gill and John. 205, because there the assignment was for the benefit of all the creditors, ratably. It is true, that the court, in declaring the right of the Bank of Maryland to make an assignment, say, that it had authority to do so, " either for the benefit of the preferred creditors, or of all its creditors, equally, as well as an individual," and *Catlin* v. *The Eagle Bank* is cited. But the case did not present the question, and it cannot, therefore, be regarded as an authority upon the point. If I were free from the authority of adjudged cases, I should be inclined to declare, that the property of a banking corporation must be regarded as a *trust fund*, for the equal benefit of all its creditors; and that no preference could, therefore, be given to any one creditor, or class of creditors; although the case, referred to from Connecticut, treats that position as having nothing in principle, analogy, or authority, to support it. In that case, the Eagle Bank, being in failing circumstances, assigned its effects to one of its creditors, without making any provision for the others. Catlin, being one of the creditors, unprovided for, filed his bill, to set aside the assignment, and to have a ratable distribution of the funds of the bank among all the creditors. The ground upon which the complainants' counsel rested their case was, that the funds of the bank were trust funds, in the hands of the directors, for the benefit, equally, of all creditors, and that no preference could be made among them. Mr. Chief Justice Hosmer considered this view of the case as wholly inadmissible. He admitted that the directors were the trustees of the stockholders, but he regarded them as no more the trustees for the creditors of the bank, than an insolvent debtor is the trustee for his creditors; and, after arguing to show that the two cases were entirely apposite, and parallel in their nature, he adds, " The novelty and unfoundedness of the plaintiffs' claim are such, that it is difficult to support, or even to oppose it, without taking leave of every established principle, and beating the air." He had before said, that no principle, analogy, or adjudged case had been referred to, and he could conceive of none, in support of such a position. It is with great diffidence, that I attempt to support a

Robins, et al. *v.* Embry, et al.

doctrine, which is thus regarded as a great legal heresy. I think, however, with much deference, that, without "*beating the air*," much may be deduced from both principles and adjudged cases, as well as from the closest legal analogies, in support of the position, that the funds of a corporate bank are held by the corporation, as trustee for the benefit of both stockholders *and creditors.* The truth of the position seems to me to result most clearly from the very nature of corporate funds, and from the known duties of the directors in relation thereto. What are the purposes, to which, in legal contemplation, these funds are to be devoted? The ultimate ends are few and simple. The funds are to be operated on, with a view to the interest of those who placed them there ; and if, in this process, debts are contracted by the bank, it follows, as a clear legal consequence, that those funds stand *exclusively* pledged for their payment. From what other source is payment to be obtained ? The private property of the stockholders is not liable ; nor is there, in this respect, any individual responsibility on the part of the directors. It follows, then, that the only source to which they can look, or to which they have a right to look, is the corporate property in the hands of the directors. That fund, then, must be considered as a special fund, set apart by law, in lieu of the private property of the corporators, as *trust fund,* for the payment of the debts of the corporation. Suppose a private person places in the hands of another a portion of his property for the benefit of his creditors, generally, would they not be entitled to share equally in the fund ?

Now, when and under what circumstances does property become impressed with a trust character ? I answer, whenever it is devoted, by private contract, or by operation of law, to special purposes, to be held for the use of particular persons. It must, thenceforth, be held in trust, to subserve the ends to which it is appointed. If the directors of a bank are to be regarded as holding the bank property, with an absolute right of disposition, they may transfer it to whom they please, with or without notice of its corporate character, freed from all claim on the part of creditors. And this is the doctrine of Mr. Chief Justice Hosmer. What remedy, then, have the creditors ? They cannot reach the property in the hands of the purchaser, —— they cannot make the stockholders liable ; and, surely,

the directors are not responsible for the exercise of a plain legal right. The creditors, then, according to Mr. Chief Justice Hosmer, have no other security, than the *naked faith* of a corporation. Experience has shown us, that this is a doubtful capital,— not always to be trusted. Is this the only security, which the legislature intended to give those who might be luckless enough to take bank bills, under the delusive notion, that the corporate property of the banks was pledged for their redemption? I think not. These bills are usually received upon the faith, and with the knowledge, that there is *no* other fund, except the corporate property of the bank, provided for their redemption ; and it would be a fraud on the public to hold, that this property was not irrevocably committed to that purpose. The remedy for these evils is, to hold that the bank property has an equity attached to it, in favor of creditors, which cannot be defeated by an arbitrary transfer thereof. But to show more clearly that a trust exists, in such cases, for the benefit of creditors, I inquire in what right, and to what use, do the directors or corporation hold such funds ? It is clear that they do not hold them in their own right, and for their own use. I am told by Mr. Chief Justice Hosmer, that they hold in trust for the benefit of stockholders. This is true ; but there must be some other trust in the case ; because, if the stockholders are the exclusive beneficiaries, they would have a right to withdraw, at any time, the whole funds of the bank, without reference to the claims of any one else. But all will admit, this cannot be done ; they can only withdraw such portion of the capital stock and profits as may remain, after paying all the debts of the corporation. It thus appears, that, although the directors, or corporation, are trustees for stockholders, they are also trustees for the creditors, who have a prior and paramount equity. Mr. Chief Justice Hosmer held, that it might as well be maintained that the property of every insolvent debtor was a trust fund, for the benefit of his creditors. To my understanding, there is not the remotest analogy, in fact or in law. The creditor of a private person has recourse to his *whole property.* The creditor of a corporation has no recourse, except to the corporate funds ; the private property of the corporators cannot be reached. The creditor of an individual debtor has not only a claim upon his pres-

ent property, but, when that is exhausted, he has still a claim upon his productive industry, in the shape of future acquisitions of property. The creditor of a bank, when he has exhausted all its corporate property, has no other recourse whatever, whether his debt be all paid or not. A private debtor has the absolute right in his property, and before any lien intervenes in favor of his creditor, *he* may dispose of it, whenever and to whomsoever he pleases. A corporation has but the naked, legal title in the corporate property, which cannot be aliened at pleasure, except it be subject to the trusts implied by law.

This question was examined by Judge Story, in the case of *Wood* v. *Dummer* (3 Mason's Rep. 311), and after reasoning upon the subject with his usual clearness and ability, he says; "To me this point appears so plain upon principles of law, as well as common sense, that I cannot be brought into any doubt, that the charters of our banks make the capital stock a trust fund for the payment of all the debts of the corporation. The bill-holders and other creditors, have the first claim upon it ; and the stockholders have no rights, until all the other creditors are satisfied." He then adds. "If the capital *stock is a* trust fund, then it may be followed into the hands of any person having notice of the trust attaching to it." And he cites *Vase* v. *Grant*, 15 Mass. Rep. 505, 517, 522 ; and *Spear* v. *Grant*, 16 Mass. Rep. 9, 15, as cases in support of that view. The case of *Mumma* v. *The Potomac Company* (8 Peters, Rep. 286) recognizes the same principles. It was there held, that the creditors of a dissolved corporation may enforce their claims against any property which had not passed into the hands of a *bonâ fide* purchaser. Thus clearly holding the corporate property, affected with a trust, for the benefit of creditors ; because, if the trust did not exist during the existence of the corporation, it evidently *did not arise out of* the mere act of its dissolution. 2 Story's Eq. 499. I think it will thus appear, that Mr. Chief Justice Hosmer had not sufficiently considered the point, when he pronounced that the idea of a *trust* in such cases, had nothing in principle, cases, or analogy, to support it. If then it be true, that the funds of a corporate bank are a trust fund, primarily for the benefit of its creditors, it follows that

Robins, et al. *v.* Embry, et al.

each and every creditor has an equal claim upon it, and that it is not competent for the corporation to defeat that right of equality, by making an assignment in favor of one class of creditors and to the exclusion of another. It is admitted, that where property is conveyed by a private individual, for the payment of debts generally, no preference can be given to one creditor over another ; that the fund so conveyed constitutes equitable assets, and must be distributed ratably among all the creditors. If a fund becomes pledged by operation of law, for the payment of debts generally, it is difficult to see why the same principle of equality should not be preserved in its distribution, with that which it is admitted must obtain, where the trust is created by the express appointment of the grantor. The ground upon which all the cases place the right of a private debtor, to prefer one of his creditors to another, is *his absolute dominion* over his own property, and his *unrestricted right of alienation.* This reason has no application to a mere corporation. They have neither the absolute right in the property itself, nor, as we have seen, the unrestricted right of alienation ; they hold in the right of others, and to particular uses. The right of alienation, is therefore necessarily restricted to the uses to which the property is legally devoted. If then the reason, which applies in the one case, does not apply to the other, so neither does the law which follows it ; *cessante ratione cessat et lex ipsa.* I think this right of giving preferences so liable to abuse, so capable of being used for fraudulent purposes, and so opposed to the spirit of equal justice, has been already carried as far as the spirit of an enlightened jurisprudence can sanction. The absolute right of property in a private debtor, carries with it an unrestricted right of disposal, which it may be impracticable for the courts to restrain, or modify, without infringing upon the law of private property ; *he* therefore may be left free to build up one, and put down another of his creditors, without reference to the justice of their claims. But even the existence of the rule, to this extent, has been deplored by many distinguished jurists. Chancellor Kent, while he admits it to be a fixed principle of law, considered that its application should be watched with jealousy, and that it should not be enlarged so as to give " it a new and dangerous facility." *Riggs* v. *Murray,* 2 Johns. Ch. 578.

I conceive, that to extend the rule to a *banking corporation,* would be to enlarge it, and give it that "new and dangerous facility" which the great and learned Chancellor said should be guarded against, with watchful jealousy. Suppose that a bank, in failing circumstances, should select some two or more of its bill-holders, and assign the whole of its assets to them, leaving all the other bill-holders wholly unprovided for. Would not such an act of gross injustice and partiality shock the moral sense of every man in the community? In such a case, there is not even the plausible pretext, which is sometimes assigned, as a reason, for allowing a private debtor to credit such a preference; to wit: that he may select his most meritorious creditors; because, in the case which I have supposed, there could be no conceivable distinction between the merits of the claims of the different bill-holders. And shall we admit that we live under a system of laws, which not only tolerates such rank injustice, but is powerless to prevent it. I ask when and where was the law established? Is it a part of the common law? Is the rule so firmly fixed by a long series of adjudged cases, and by the customs and approval of society, as to render it unsafe and unwise, that it should be overturned? It is indeed the law of the Supreme Court of Connecticut, and Arkansas; but I do not find that it has any other sanction; and, with all my respect for those distinguished tribunals, I must be permitted to doubt its soundness, its morality, and its policy.

The reason which led to the establishment of the rule, has no application to such a case. The corporation is the *creature of* legislative will; it has no such general powers, *or rights* of property, as those which belong to a private citizen. Its powers are limited to the ends for which it was instituted.

The cases referred to, which sustain the right of a corporation to create such a preference, say, that there is "nothing in the charters to prohibit it." I answer, that there is nothing in the charter which grants it; and that the courts will not, by construction, imply a power, not necessary to the ends of its institution, which it is admitted may be productive of both fraud and injustice. Public policy, and the principles of equal justice, require that the property of a debtor shall be equally devoted to the payment of

his creditors, where the rule can be enforced, without infringing upon the laws of private property. No such infraction is involved in applying the principle to corporations. I then repeat, that I incline to the opinion, that the property of a corporation should be regarded as an equitable fund, so far, at least, as to preserve the principle of equality among its creditors. But I find it unnecessary to express a decided opinion upon this point; because after full reflection, I am satisfied, that the assignment, in this case, is not liable to the objection of giving a preference, at least, in the odious sense in which it is usually found in such assignments. It is true, that the loan for completing the railroad is to be *first* paid; but the assignment contemplates a full payment *afterwards*, to all the other creditors, equally with those who might become such, through the medium of the intended loan. This case, therefore, bears no analogy, in principle, to the cases usually found upon the subject; ordinarily, the fund assigned for distribution, is limited and circumscribed to the amount of property the assignor then has; and the postponed creditors are left to take such fractional parts of their debts, as they can get out of the fragments that may remain, after paying off preferred creditors. But here an unlimited and continually increasing fund is indefinitely assigned, until, by its annual accumulations, the whole number of creditors may be fully paid. No one creditor is asked to compound his debt, by accepting less than its full amount, as a condition to his participation in the fund. No release is stipulated for, until full payment is made. The accruing profits of the railroad stand pledged from year to year, until all the creditors are satisfied. I pass next to the consideration of the objections, which are alleged to exist on the face of the assignment itself. Prefatory to this, it may be stated, that it is essential to the validity of this species of conveyance, that the assignor shall part, absolutely and irrevocably, with all title to the property; and all authority and control over it; free from all conditions and restrictions, that will unnecessarily delay, and embarrass the rights of creditors. There must be no reservation out of the property for his benefit, unless it be the surplus, after all the debts are paid; nor any authority to control or direct the assignees in the execution of the trust; and all the uses must be clearly and

explicitly declared.    Where the assignment is obnoxious to any of these objections, it will be declared void.    1.  The first and leading objection urged by counsel, is the provision which authorizes the assignees to borrow two hundred and fifty thousand dollars, on the credit of the bank, for the purpose of completing the railroad. It is insisted that this is virtually a reservation to the use of the corporation, of the amount to be borrowed, because it was to be vested in the railroad, which is still the property of the corporation.

The deed recites, that the bank was in a condition which rendered it necessary and proper, that it should make an assignment for the benefit of its creditors.    It also shows that a portion of its assets consisted in the railroad, which was then in an unfinished condition, and which it had not the ability to complete for the want of funds.    The bank was bound, in good faith, to make the road, as well as its other assets, tributary to the payment of its debts. If the railroad had been left altogether exempt from any charge, on account of the debts, this might well have subjected it to the charge of fraud ; because I infer, that that was in reality the most valuable item in its assets.    It is evident, from the history of banking in this State, about that time, and since, that no further profits could be anticipated from the bank itself.    The only means, therefore, left it for increasing its ability to pay its debts, was the completion of the railroad, and the appropriation of its subsequent profits to that purpose.

But how was the railroad to be made available in the payment of debts ?    It was then not more than half completed, and was not, therefore, in a condition to make any profit ; if abandoned at that time, it would prove a total loss to the company, of the large amount which had been already expended on it ; and have thus diminished, if not totally destroyed, its ability to meet the demands of its creditors.    Only about twelve months of the time, within which the road was to be completed, then remained ; and, by the express terms of the charter, it was to become null and void, if the road was not finished within that time.    If a forfeiture of the charter was suffered, not only the railroad would be lost, but the bank would have been disabled from realizing the other portion of

its assets, which were assigned.  A large portion of the assets consisted in outstanding debts due the bank ; if the charter had been forfeited, these debts, upon well settled principles of law, would all have been extinguished.  The real estate of the bank would have reverted back to the original grantors ; and the personal estate have vested in the government.  2 Kent's Com. 307. Injurious and destructive to all parties concerned as these consequences would have been, yet they would inevitably have followed a forfeiture of the charter ; because there is no provision in the charter, nor in the general laws of the land, guarding against such a result.  It would seem then, that, in order to save anything for either the corporation or its creditors, it was indispensable that the railroad should be completed.  But how was this to be done ? The bank had not the means.  It could only be accomplished by the means resorted to.  If an assignment be otherwise free from the imputation of fraud, it is not vitiated, by being made in part to secure anticipated advances ; and especially where those advances are intended to be in aid of the general purposes of the assignment.  It is difficult to see upon what ground creditors could object to such a provision, where its tendency would be to increase the fund assigned for their benefit.  In the case of the *United States* v. *Hooe* (3 Cranch, 73), the Court say, " It is not in itself exceptional, that property should be bound for future advances. It may indeed be converted to improper purposes, but it is not positively inadmissible."  The same doctrine is recognized in the case of *Hendricks* v. *Robinson*, 2 John. Ch. Rep. 283.  It is true, it was held in the case of *Barney* v. *Hempstead* (7 Paige's Rep. 568), that if an assignment of this character provides for the payment of future advances to the assignor, or to the assignees for his benefit, out of the property assigned, in preference to the then existing creditors, such assignment is void as against such creditors.  But the reason upon which that decision is founded, viz., that such provision was for the benefit of the assignor, at the expense and to the prejudice of his existing creditors, has no application to the case before me.  I think I have already shown that, in this case, the contemplated advances, so far from prejudicing, or subtracting from the fund assigned, is, in reality, calculated

to augment it, and thus redound to the benefit of the creditors themselves. But if this provision is to be regarded as a strict reservation, yet the deed contemplates, and provides for the payment of all the debts of the corporation, before there can be any resulting use in its favor, in regard to the road ; and it is clear, upon principle, that an assignor, in such cases, may rightfully, and honestly reserve to himself, any surplus that may remain, after the payment of all debts ; because the creditors can then have no concern whatever with such surplus ; and such a reservation is nothing more than what would result from the operation of the law itself. *Halcey* v. *Whitney*, 4 Mason's Rep. 206. In all the cases to which I have been able to refer, where assignments have been held void on account of some reservation therein, it will be found that they turned upon the fact, that the reservation in favor of the debtor was absolute and unconditional, without regard to the question, whether all his debts were paid or not. *Burd* v. *Fitzsimmons*, 4 Dallas, 76 ; *Austin* v. *Bell*, 20 John. Rep. 442 ; *Harris* v. *Sumner*, 2 Pick. Rep. 129 ; *Seaving* v. *Brinkerhoof*, 5 John. Ch. 329. In all these cases, the vice seems to have consisted in the provisions by which the debtor reserved to himself rights in and authority over the property assigned, which might be so exercised, as to be destructive to the interest of the creditors, for whose benefit the assignments professed to be made. 2. The next objection to the validity of this assignment, is, that it transfers to the assignees the power of managing and controlling the railroad. It is said that the management of the road is an act of corporate power, which can only be exercised by the corporation itself, and cannot be delegated to others. To this it may be replied, that a corporation can only act through the intervention of agents ; the corporation itself is a mere artificial or ideal person, having neither volition nor action. And I apprehend that it may be laid down as a general rule, that a corporation may appoint *any one*, for the doing of any act, the performance of which is not expressly or necessarily limited, by the terms of the charter, to the directors or other officers of the institution. Angell and Ames on Corp. 121, 149. An illustration of this rule is found in the case of *Ridgway* v. *The Farmers Bank*, 12 Serg. &

Rawle, Rep. 265. It was there held, that the directors had power to authorize the president and cashier to borrow money for the use of the bank. Here the corporation could not assign the railroad itself, because that is a mere *franchise*, and is not in its nature assignable ; the profits of the road was the only thing in connection with it, which could be assigned, or which *was* actually assigned. There was, therefore, an obvious propriety in giving to the assignees, temporarily, the control of the road, with a view to its completion, and the receipt and application of its profits to the payment of debts. In the *management of the road*, they were the mere agents of the corporation, and I do not see how the leading objects of the assignment could have been accomplished in any other form. In the case of *Cunningham* v. *Freeborn* (11 Wend. Rep. 240), the subject of the assignment was an iron foundry, and the assignee was clothed with power to keep the establishment in operation ; and to work up, and sell, the unmanufactured articles then on hand. Justice Nelson, referring to this feature of the case, says : " In all this I can perceive no violation of law, or of honesty and fairness. It was a kind of property not readily convertible into money, and valuable only in the business in which it had been employed ; and we cannot say that provision in the assignment was injudicious, much less illegal." The case of *De Forrest* v. *Bacon*, 2 Conn. Rep. 633, is an authority to the same point. By the 17th sec. of the bank charter, in the case before me, it is provided that a committee of stockholders shall be the superintendents of the railroad. Even if this provision has any bearing upon the question before me, still it does not appear but what these assignees are such stockholders, and, if so, their appointment would be within the letter of the charter. But suppose the directors had no power to constitute the assignees their agents, with a view to the control of the road, and the receipt of the profits thereof ; can the validity of the act be called in question in this manner ? Is it not a matter wholly between the directors and the stockholders, or between the stockholders and the government, as a question of violation of the charter ? If the stockholders have tacitly ratified it by their acquiescence, and the State has not elected to regard it as a violation of their charter,

can the validity of the act be questioned by another person? I
think it cannot. And this I understand to have been the opinion of
the Supreme Court of the United States, as expressed in 12
Wheaton's Rep. 89, in which the Court adopt the rule as de-
clared in the *Bank of the Northern Liberties* v. *Cresson*, 12 Serg.
& Rawle, 306. I consider it as a mere question, whether the cor-
poration has exceeded its powers, or not, and that cannot be
inquired into, either in this form, or at the instance of these defend-
ants. *Silver Lake Bank* v. *North*, 4 John. Ch. Rep. 370;
3 Rand. Rep. 136.

3. Another objection to this assignment, is, that the directors have
reserved the power to appoint new trustees, to fill any vacancy that
may occur by death or otherwise; and the case of *Riggs* v. *Mur-
ray*, 2 John. Ch. Rep., is relied on as an authority in support of
this objection. It is true, that the reservation by the grantors in the
deed, of the power to *remove* and appoint other trustees, was one
of the features upon which that assignment was declared fraudulent
and void. But the leading view, in that case, was the reservation
of power to *revoke*, *alter*, and *vary* the trusts which were declared in
the deed. The reservation, in that case, was not merely a power
to appoint new trustees, when accident or design should create a
vacancy; but a power to *remove*, at pleasure, those already ap-
pointed; thus retaining a control over the trustees, and holding them
in obedience to the will of the grantors: and this was justly consid-
ered as equivalent to a power on their part to control and direct the
administration of the whole trust-fund. It may be readily admitted,
that such a provision is wholly inconsistent with the very nature and
purposes of such an assignment: to be effectual, it must divest the
grantor of all control or authority over the property assigned; hav-
ing parted with the title, he must also part with all dominion and
control over it. In this case, the power to appoint a new trustee to
fill any vacancy that might occur, seems to have been solely and
simply intended to keep the trust alive, and in active operation. It
is expressly stipulated, that the failure of the board of directors to
make such an appointment, shall in nowise affect the trust itself;
and that, in such event, the appointment shall be made by the court
of chancery. And it is expressly provided, that the directors shall

Robins, et al. *v.* Embry, et al.

not have the power to *alter*, *change*, *modify*, or *revoke* the trusts there declared.

4. It is next insisted, that the deed is void, because it locks up the property of the grantor for an unreasonable time, before any payment or distribution can take place. What is a reasonable time, in such cases, must depend upon the nature and circumstances of each particular case. What would be reasonable and proper in one case, might be utterly unreasonable and improper in another. Too limited a period of action under the assignment, may be as strong evidence of fraud, as one which is too extended. The time must always be regulated by the nature and character of the property assigned; and the time necessary to collect and convert it into money. Regard must also be had to the number and distance at which creditors may be placed. For instance, an assignment to a trustee in this State, limiting the time for creditors to file their claims to thirty days, would be clearly fraudulent against creditors residing in London. On the other hand, an assignment extending the time to twelve months, where all the creditors reside in the neighborhood, would be equally fraudulent, unless, from the nature of the property assigned, it could not be put in a shape for distribution at an earlier period. Applying these principles to the case before me, I do not think that the time given is an objection to the validity of the assignment. Much of the property assigned consisted in debts due the bank from persons widely scattered over the country; and much time would necessarily be consumed in arranging, collecting, or securing these liabilities. It is, moreover, evident, that a large portion of the creditors were those who held the checks, certificates of deposit, and bank notes, which had been issued by the corporation, and which may be fairly presumed to have circulated over a wide extent of country. It was, therefore, proper that full time should be given to this class of creditors to come in under the deed.

5. A fifth objection is, that the assignees are clothed with power to compromise with the debtors of the bank. To determine this point, it is necessary to look to the circumstances under which this discretion was delegated; and the restrictions under which it is to be exercised. It must be remembered, that the assignment was made at a period of great pecuniary embarrassment in this State;

and that failures and insolvencies were daily occurring. Under this state of things, it was reasonable to suppose that many of the debts due the bank, which were assigned, were of a doubtful character, and if anything could be saved from them by compromise, surely, the creditors of the bank cannot complain ; and, especially, as the deed expressly requires that the compromise shall be made in such manner and upon such conditions, as, in the judgment of the trustees, would be to the interest of the creditors of said bank. The case of *Graver* v. *Wakiman* (11 Wend. Rep. 187, 202) is supposed to be an authority in support of this objection. I do not so understand it. There, the assignment established preferences among different classes of creditors, and gave the assignee the power of compounding with any one or more of the creditors of the assignor, still having regard to the order of preference established by the deed. This was considered as clothing the assignee with power to make further preferences among the creditors, and thus produce further inequality between them ; because he might pay more to one, and less to another, than they would be really entitled to under the deed, according as he might operate upon the fears of the one or the hopes of the other. This, as I understand it, is clearly the substance of the decision upon that feature of the assignment. But here, the assignees are authorized to compound, not with the *creditors*, but with the debtors ; and then only with a view to the security of the debt, and the interest of the creditors.

6. The next objection is, that the assignees are constituted the joint agents of both the corporation and the creditors. But this joint agency only extends to the management of the railroad ; and I understand it to mean, that, so far as the completion and management of the railroad is concerned, they are to be regarded as the agents of the corporation ; but so far as it relates to the receipt and payment of the profits or tolls of the road, they are to be considered as the agents or trustees of the creditors. The corporation was not dissolved by the act of assignment, and the railroad, being a mere franchise, was not assignable ; nor is it attempted to be assigned ; it still remained where the charter placed it — in the hands of the corporation itself. The corporation might, therefore, so far as the construction and preservation of the road was concerned,

make the assignees accountable to them as their agents. That this is the extent of the agency is perfectly clear ; because, so far as the control and administration of the trust-fund is concerned, the corporation is completely excluded from all power and authority whatever, by the very terms of the assignment. The idea of an agency over anything, presupposes a power and authority in the person creating it. But here, there is no such power or authority in the corporation, so far as the leading objects of the assignment are concerned. The trusts are all pointed out and defined, and the trustees are the sole and exclusive agents through whom they are to be executed. I cannot, then, regard this provision as establishing an authority in the corporation over the assignees, in the discharge of those duties which relate to the creditors.

7. The next objection which is urged against the validity of this assignment, grows out of the provision by which the assignees are prohibited from paying any claim except a particular class of debts, unless the same had been previously pronounced valid by the board of directors ; or unless its validity was settled by suit, or determined by arbitrators to be chosen by the creditors and the assignees. If the power of determining, finally and conclusively, what claims should be allowed, had been reserved to the board of directors alone, I could have no hesitation in declaring the assignment void. But, subject to the qualifications under which their agency in the matter is placed, I am induced to regard that provision as a mere salutary precaution, to guard against any imposition being practised upon the assignees by means of unjust or fraudulent claims. The trustees could not be presumed to be familiar with the nature of the claims against the bank, and nothing could be more proper than that those claims should be subjected to such scrutiny as would prevent honest creditors from being injured by the allowance of unjust or dishonest claims ; and I see nothing objectionable in the mode pointed out for that purpose.

8. The omission to annex a schedule of the property assigned, is also made an objection to the validity of this assignment. The property is described as all the estate of the corporation, whether real, personal, or mixed, and all the stocks, goods, wares, merchandise, bills receivable, bonds, notes, book-accounts, claims, demands,

judgments, and choses in action.   This, I think, is a sufficient general description of the property, to give precise information of its nature and extent by reference and inquiry.   It is perfectly competent for any creditor to call for a more detailed description of the property, whenever it may be desired.   In the case of *Cunningham* v. *Freeborn* (1 Edw. Ch. Rep. 264), it was objected to the validity of the assignment, that there were no schedules annexed, to show the particulars of the property assigned, nor the names of the creditors.   But it was held, that such omissions have never of themselves been regarded as sufficient to avoid an assignment.   In the case of *Hatch* v. *Smith* (5 Mass. Rep. 42), the assignment was assailed upon the ground of the want of a particular description of the property conveyed : but the Court said the description was sufficient ; because, upon investigation, every particular might be easily known.   The same answer applies to the case before me.

9. A ninth objection consists in the covenant, by the assignees, to exhibit, periodically, a statement of their accounts to the board of directors.   This is supposed to be incompatible with honesty and fairness in the assignment.   To my understanding, nothing could possibly be more harmless or innocent in its effect.   How an occasional inspection, by the directors, of the accounts of the assignees, could poison and contaminate the assignment itself, or how it could be construed into a reservation of power over the assignees, at war with the interest of the creditors, I have been unable to perceive.   It is to be remembered, that this is an assignment of all the disposable property belonging to the corporation, by which, ultimately, a full payment of all its debts is contemplated.   Nothing could be more natural or proper, therefore, than that the corporation should require to be advised, as the execution of the assignment progressed, whether there was a prospect that any surplus would result to their use, after the payment of the debts ; and, also, when they might resume the active control of the railroad, which they had temporarily parted with, to the assignees, to be held until, by the aid of its profits, the debts might be extinguished. This is one of the grounds upon which the Supreme Court of Louisiana decided this assignment to be void.   I have not before referred to that opinion, although I have already examined all the

grounds upon which it seems to have turned. It is the opinion of a civil law court, not very familiar with our system of jurisprudence, by which the validity of the assignment must be determined. It is evident, at all events, that the case was not investigated with the ability and research that usually characterize the decisions of that learned court. All the features of the assignment, which are supposed to be objectionable, are thrown together in close array, and the court, looking to their combined effect upon the instrument, say they are confirmed " in the opinion, that this is not such an assignment of property, for the benefit of creditors, as would be held valid by the laws of Mississippi." It would certainly have been more satisfactory, if the several objections, which are there crowded together, and from which a general conclusion is deduced, had been separately examined, and their precise bearing upon the validity of the assignment more particularly pointed out.

10. The last, and by far the gravest objection, to my mind, is the provision, in the deed, which requires the assignees to pay all the *necessary* expenses of the president, directors, and company of the bank, in the management of the corporation. If this is to be understood as a reservation for the support of the banking part of the corporation, in contradistinction from the expenses necessary to the preservation of the railroad, it will be difficult, according to adjudged cases, to redeem it from the imputation of being such a reservation, in favor of the assignor, as to give evidence of an intention to hinder and delay creditors, unless that inference is repelled by other features of the case. And if this be its true character, it must be regarded as a destroying vice, tainting and affecting the whole instrument ; for, although there is some diversity of authority on this latter point, I consider the better opinion to be, that where such an instrument is void in part, it is void. *in toto*. *Mackie* v. *Cairns*, 5 Cow. Rep. 547 ; *Hyslop* v. *Clark*, 14 John. Rep. 465 ; *Austin* v. *Bell*, 20 John. Rep. 449. What, then, is the true construction of this reservation ? The counsel for the complainant insist, it can only mean the expenses necessary to the management and keeping up of the railroad ; because, by the assignment, the *banking* operation ceased, and no expenses could be *necessarily* incurred in that particular. If this be the true interpretation, that

Robins, et al. *v.* Embry, et al.

provision is not objectionable, since it would be necessary to keep up and repair the road in order to keep up the fund, from which the creditors are, in part, to be paid ; and it would, therefore, be rather in their favor than at their expense.   This construction derives some force from the fact, that it is only the net proceeds of the railroad that are actually assigned to the trustees.   It would seem, therefore, that a portion of the gross profits are left to be applied, by the directory, to the necessary expenses of keeping up the road, and this may be what is meant by "*necessary* expenses in the management of the corporation ;" but it is by no means clear, that this is the true intention of that clause.   But suppose it is to be regarded as a reservation for the benefit of the bank, distinct from the road ; still, I incline to think, that, looking to the whole scope of the assignment, the inference of fraud, deducible from this feature, is fully repelled.   In all the cases, in which a reservation, for the benefit of the assignor, has been held to avoid the assignment, it will be found, that the amount of the fund assigned is *limited* and fixed, and the reservation made without reference to the sufficiency of the fund to satisfy all the debts.   And this doubtless constitutes the great blemish in all such cases ; because, if the creditors are to be fully paid, notwithstanding such a reservation, they cannot complain on that account.   It is the *fact*, that such a reservation hinders and defrauds them of their *full* and just demands, that renders it void.   If, then, the reservation has not that tendency, so neither should it have that effect.   *Halcey* v. *Whitney*, 4 Mason's Rep. 206.   But what is the nature, in this particular, of the assignment before me ?   It is not merely an assignment of a limited and definite amount of property ; but, in addition to the property specified, there is an indefinite assignment of the annually-accruing profits of the railroad, to be successively applied to the payment, not of a part, but to the whole, of the debts ; and, from anything that now appears to me, I must presume that the fund assigned is sufficient, or will prove so, to accomplish that purpose.   It is not, then, a reservation in favor of the assignor, whether all the debts are paid or not.   The reason, therefore, which is usually urged against such reservations, would seem not to apply.   I think it is not sufficient, to say that this reservation must

Robins, et al. *v*. Embry, et al.

protract the period within which the creditors can be paid, because all assignments of this character tend, necessarily, to some extent, to delay creditors in the assertion of their claims ; but there must be a fraudulent intent manifested to produce such delay.

From this view of the reservation in question, I think it is not, of itself, such evidence of fraud as should induce me to declare the assignment void on its face.   If, when the case comes to be examined upon its facts, I should find that the inference of fraud, arising from this feature of the case, is not repelled by other provisions, and it should turn out that it was intended to include a salary to the president, cashier, and other officers, a different opinion may be pronounced.

I have now examined all the objections to this assignment. I have been fully impressed, at every step, with the difficulty and importance of the case.   Many of its features are without precedent, and call for a new application of principles.   It pointed, to a great extent, along an untrodden path ; and, although I have bestowed upon it the most patient and earnest consideration, I cannot say that I am entirely free from doubt as to the correctness of all the conclusions upon the various points which I have decided ; and I shall hence be gratified to see it transferred to a higher tribunal, where my views may be either sustained, or my errors corrected.

Let the demurrer be overruled.